AFFIRM; Opinion issued January 28, 2013.



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-11-01253-CV

### RAYMOND JENNISON, Appellant

### V.

### JEANETTE PRASIFKA, Appellee

On Appeal from the 101st Judicial District Court
Dallas County, Texas
Trial Court Cause No. DC-10-07569-E

# OPINION

Before Justices Moseley, Fillmore, and Myers
Opinion By Justice Fillmore

Appellant Raymond Jennison appeals the trial court's order dismissing his lawsuit against

appellee Jeannette Prasifka. Jennison's sole issue is whether the trial court correctly determined that

it lacked subject matter jurisdiction based upon the ecclesiastical abstention doctrine.[1] We affirm

the trial court's order dismissing Jennison's claims for lack of subject matter jurisdiction.

---

[1] In Texas, this doctrine is sometimes referred to as one of "deference," "ecclesiastical abstention," or "ecclesiastical exemption." *See Schismatic & Purported Casa Linda Presybterian Church in Am. v. Grace Union Presbytery, Inc.*, 710 S.W.2d 700, 703 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (the "deference rule"); *Patton v. Jones*, 212 S.W.3d 541, 547 (Tex. App.—Austin 2006, pet. denied) ("ecclesiastical abstention"); *Tran v. Fiorenza*, 934 S.W.2d 740, 743(Tex. App.—Houston [1st Dist.] 1996, no pet.) ("ecclesiastical exemption").

## Background

In June 2010, Jennison filed suit against Prasifka, an Episcopal Church parishioner, for "slander and tourtuous [sic] interference with a contractual relationship, and wrongful discharge." In his petition, Jennison states he is a "bi-vocational" minister—an ordained Episcopal priest and a stockbroker employed by First Canterbury Securities. According to his pleading, in February 2008, he signed a contract with the Right Reverend James Stanton (Bishop Stanton) to serve as a priest for Saint David's Episcopal Church in Garland, Texas.

In his pleading, Jennison states that in 2009, another employee of First Canterbury Securities, who served as an Episcopal priest, was found by a "securities agency" to have defrauded an individual and was ordered by the regulatory authority to make a refund to that individual. Jennison alleges that in reliance upon the ruling of the regulatory authority, the First Canterbury Securities employee was suspended as an Episcopal priest by Bishop Stanton. In apparent contrast to the circumstances involving the other First Canterbury Securities employee serving as an Episcopal priest, Jennison's pleading states that Bishop Stanton's "angst was that he could take no action against [Jennison] because no one had complained to the diocese about him." Jennison alleges that "[i]n response to [an] invitation" to complain to the Episcopal Diocese of Dallas (the Diocese) about Jennison, Prasifka complained to the Diocese that Jennison had been "churning" her brokerage account and demanded he close that account. A copy of Prasifka's September 7, 2009 letter to the Diocese is attached to Jennison's pleading. In that letter, Prasifka states that in response to a request from Reverend Canon Neal Michel, she is forwarding a letter of formal complaint "affirming" her conversation with Canon Michel and Suffragan Bishop Lambert.

Jennison alleged that Prasifka "slandered [him] to the Bishop," and "in reliance upon [Prasifka's] unverified complaint," Bishop Stanton placed Jennison on inactive status as a priest,

having previously demanded that Jennison terminate all securities contracts with parishioners. Jennison asserts Bishop Stanton "defacto" terminated his employment contract. Jennison alleges that, as a "sole" proximate result of the "slander," Bishop Stanton wrongfully discharged him.

In response to Jennison's petition, Prasifka filed a motion to dismiss and plea to the jurisdiction, asserting the dispute in the case involves ecclesiastical matters over which the trial court has no jurisdiction. Alternatively, Prasifka requested the trial court to abate the suit pending the determination of ongoing proceedings in the Diocese. Prasifka answered Jennison's lawsuit subject to her motion to dismiss and plea in abatement.

Jennison also filed an "answer" to a purported intervention in the lawsuit against Prasifka by "counter petitioner" Bishop Stanton. Attached to Jennison's "answer" to the purported intervention is a copy of a July 12, 2010 letter to him from Bishop Stanton that Jennison characterized as an intervention in the lawsuit.[2] In that letter, Bishop Stanton states it had come to his attention that Jennison had filed the lawsuit against Prasifka, "a member of the Episcopal Church and a Communicant in this Diocese." As Jennison's Bishop and Pastor, Bishop Stanton issued his "Godly Admonition and Pastoral Directive" to Jennison to withdraw his lawsuit against Prasifka, stating he "[took] this action for the following reasons:

> 1. Your complaint to the Court . . . seems to suggest that you were "discharged" from your priestly ministry at St. David's because you were "slandered" by Ms. Prasifka . . . . You know this is not true. You resigned your position effective 31 Dec. 2009, and agreed to retire from active ministry rather than go through a formal Ecclesiastical Court proceeding.
>
> 2. This suit is a flagrant breach of the pastor/communicant relationship, and violates any number of biblical principles and acceptable pastoral norms, including the care which a pastor or shepherd should render to the people. . . .
>
> 3. This suit appears to be a violation of the Canons of this Church under which you

---

[2] There is nothing in the record to indicate that Bishop Stanton filed an intervention in Jennison's lawsuit against Prasifka.

were ordained and to which you promised to conform, namely:

Title IV.14.2: "No member of the Clergy of this Church may resort to secular courts . . . for the purpose of resolving any dispute arising [under the Constitution and Canons] . . ." A number of statements [sic] your complaint will involve the Court in making determinations of specific Ecclesiastical and Canonical procedures and actions.

Title IV.14.9: "No person subject to the authority of this Church may attempt to coerce or by any other means improperly influence, directly or indirectly, . . . any person involved in such [disciplinary] proceedings . . ." Your lawsuit clearly has the effect of intimidating a formal Complainant and potential witness in disciplinary proceedings.

Title IV.3.19: Under this Canon, Ms. Prasifka had a legitimate expectation of confidentiality, which you have now violated by bringing this lawsuit.

These matters clearly affect the Doctrine, Discipline and Worship of the Episcopal Church as well [sic] the manner of life and behavior of a Priest of this Church.

I direct that you inform me that you have withdrawn this suit no later than 5:00 p.m. CDT, 16 July 2010.

The record contains a business records affidavit executed by Bishop Stanton attaching records from the Diocese "relat[ing] to an ecclesiastical matter between the church and one of its ministers." One of the records attached to the business records affidavit is a November 11, 2010 Presentment by The Standing Committee of the Diocese against Jennison before the Diocese's Ecclesiastical Trial Court. The Presentment, signed by Reverend David Houk, President of the Standing Committee of the Diocese, states that a complaint had been filed. The Bishop, having received additional information accusing Jennison of acts which, if true, would constitute an offense, referred the matter to the Standing Committee, acting as the Diocesan Review Committee, for further action. According to the Presentment, the Standing Committee referred the matter to the Church Attorney. In turn, the Church Attorney investigated the matter and submitted a confidential report to the Standing Committee, which by a majority vote of its entire membership determined that the information before it, if proven at trial, provided reasonable cause to believe that an offense had been committed by Jennison. The Diocese Standing Committee's Presentment contains ten counts against

-4-

Jennison. Count I addresses "conduct unbecoming a member of the clergy." One of the two charges against Jennison in Count I is based on Prasifka's complaint against Jennison. Also attached to the business records affidavit is the Diocese's May 4, 2011 Notice of Deposition, signed by Bishop Stanton, whereby Bishop Stanton pronounced a sentence of deposition, depriving and discharging Jennison of "all rights, duties, obligations, privileges and entitlements in connection with and pertaining to the Ministry of the Protestant Episcopal Church in the United States of America."

The trial court signed the order granting Prasifka's motion to dismiss Jennison's lawsuit against Prasifka with prejudice. Jennison's motion for new trial was denied, and he filed this appeal of the trial court's order of dismissal.

## Discussion

The question in this appeal is whether the trial court correctly determined that it lacked subject matter jurisdiction over Jennison's claims against Prasifka. In addressing that question, we must consider whether Prasifka's statements to the Diocese were made in connection with church governance or discipline, and thus protected under the First Amendment of the United States Constitution by the ecclesiastical abstention doctrine.

Jennison contends Prasifka's reliance on the ecclesiastical abstention doctrine fails because Prasifka is not an officer of the church and Jennison's lawsuit is not against the church. Prasifka responds that her allegedly defamatory statements to the church were made in response to an investigative inquiry from the church, as Jennison's employer, and issues involving the employment relationship between Jennison and the Episcopal Church were "only resolvable under the Cannons [sic] of the Church and were ultimately resolved in a separate ecclesiastical proceeding."

A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of a cause of action. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). "Lack of

jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis of the jurisdictional challenge." *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007). We review a plea questioning the trial court's subject matter jurisdiction de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). In deciding a plea to the jurisdiction, a court must not weigh the claims' merits and should consider only the plaintiff's pleadings and the evidence pertinent to the jurisdictional inquiry. *Cnty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002).

The ecclesiastical abstention doctrine arises from the Free Exercise Clause of the First Amendment to the United States Constitution. *See* U. S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."). After the ratification of the Fourteenth Amendment, the limitations on Congress in the First Amendment became equally applicable to state action abridging religious freedom. *See Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947). Government action can burden the free exercise of religion in one of two ways: by interfering with an individual's observance or practice of a particular faith, *see, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993), or by encroaching on the church's ability to manage its internal affairs, *see, e.g., Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116 (1952); *see also, Retta v. Mekonen*, 338 S.W.3d 72, 76 (Tex. App.—Dallas 2011, no pet.) (citing *Westbrook*, 231 S.W.3d at 395) ("The First Amendment prohibits government action, including court action, that would burden the free exercise of religion by encroaching on a church's ability to manage its internal affairs.").

Courts give great deference to the First Amendment's freedom of religion guarantee. *See In re Godwin*, 293 S.W.3d 742, 745 (Tex. App.—San Antonio 2009, orig. proceeding). "The Supreme Court has broadly interpreted the command to 'make no law' [respecting an establishment of religion or prohibiting the free exercise thereof] as prohibiting all forms of government action,

including both statutory law and court action through civil lawsuits." *Turner v. Church of Jesus Christ of Latter-Day Saints*, 18 S.W.3d 877, 890 (Tex. App.—Dallas 2000, pet. denied). The Free Exercise Clause prohibition of government action that burdens the free exercise of religion "by encroaching on the church's ability to manage its internal affairs" precludes civil courts from intruding into inherently "religious" or "ecclesiastical" matters. *Westbrook*, 231 S.W.3d at 395, 398–99.

The ecclesiastical abstention doctrine stands for the proposition that the First Amendment prohibits civil courts from exercising jurisdiction over matters concerning "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them." *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 713–14 (1976); *see also Patton v. Jones*, 212 S.W.3d 541, 547–48 (Tex. App.—Austin 2005, pet. denied) (ecclesiastical abstention doctrine "prevents secular courts from reviewing many types of disputes that would require an analysis of 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required'") (quoting *Watson v. Jones*, 80 U.S. 679, 733 (1872)); *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.) ("It is without dispute that the First Amendment prohibits civil courts from intruding into the church's governance of 'religious' or 'ecclesiastical' matters, such as theological controversy, church discipline, ecclesiastical government, or the conformity of members to standards of morality."); *see also Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 13 (Tex. 2008) (dismissing case involving ecclesiastical issues for want of jurisdiction).

"The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern." *McClure v.*

*Salvation Army*, 460 F.2d 553, 558–59 (5th Cir. 1972); *see also Hosanna-Tabor Evangelical Lutheran Church & School v. E.E.O.C.*, 132 S. Ct. 694, 706 (2012) ("According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions."); *Dean*, 994 S.W.2d at 395 (issue of a pastor's ouster is ecclesiastical in nature); *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no writ) (relationships between organized church and its ministers is church's lifeblood). "[C]ourts should not involve themselves in matters relating to the hiring, firing, discipline, or administration of clergy." *Lacy v. Bassett*, 132 S.W.3d 119, 123 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

To determine whether the ecclesiastical abstention doctrine applies or, conversely, whether subject-matter jurisdiction exists, "courts must look to the 'substance and effect of a plaintiff's complaint to determine its ecclesiastical implication, not its emblemata.'" *Westbrook*, 231 S.W.3d at 405 (quoting *Tran*, 934 S.W.2d at 743). Courts applying the ecclesiastical abstention doctrine "have consistently held that civil courts lack subject matter jurisdiction to decide [a case involving an employment decision by a religious institution] if the employment decision concerns a member of the clergy or an employee in a ministerial position." *Patton*, 212 S.W.3d at 547; *see e.g., Green v. United Pentecostal Church Int'l*, 899 S.W.2d 28, 30 (Tex. App.—Austin 1995, writ denied). Even though the elements of a common law tort such as defamation, "may be *defined* by secular principles without regard to religion, it does not necessarily follow that *application* of those principles to impose civil tort liability would not run afoul of protections the constitution affords to a church's right to construe and administer church doctrine." *Schubert*, 264 S.W.3d at 10 (emphasis in original) (citing *Westbrook*, 231 S.W.3d at 400); *see also Patton*, 212 S.W.3d at 553 ("Under most circumstances, defamation is one of those common law claims that is not compelling enough to

overcome First Amendment protection surrounding a church's choice of pastoral leader. When a defamation claim arises entirely out of a church's relationship with its pastor, the claim is almost always deemed to be beyond the reach of civil courts because resolution of the claim would require an impermissible inquiry into the church's bases for its action.") (quoting *Heard v. Johnson*, 810 A.2d 871, 875 (D.C. App. 2002)).

The Texas Supreme Court has applied the ecclesiastical abstention doctrine to tort claims brought by a church member against other church members who were not in authority positions. *See Schubert*, 264 S.W.3d at 12 (holding court lacked jurisdiction to consider church member's assault claims against other church members). The supreme court has also applied the ecclesiastical abstention doctrine in the context of a claim brought by a church member against her counselor and pastor for statements made in connection with the church's ecclesiastical disciplinary process. *Westbrook*, 231 S.W.3d 389. In *Westbrook*, Peggy Penley sued CrossLand Community Bible Church (Crossland), a secular professional counselor who also served as the pastor of CrossLand (Westbrook), and the church elders for defamation, negligence, breach of fiduciary duty, and intentional inflection of emotional distress. Penley asserted in her lawsuit that during a secular counseling session with Westbrook, she disclosed marital infidelity, and that Westbrook and church elders subsequently published information concerning her actions to the church's membership. In response to Penley's claims, Westbrook filed a plea challenging the court's jurisdiction, contending the suit involved an ecclesiastical dispute concerning a church disciplinary matter. *Westbrook*, 231 S.W.3d at 394. The church and the elders filed a similar motion to dismiss. The trial court granted the defendants' motions and dismissed the case. Penley pursued only her appeal of Westbrook's dismissal. *Id.* at 394. The publication about which Penley complained was made in the course of the church disciplinary process and communicated by Westbrook pursuant to the requirements of

that process. *Id.* at 402. The supreme court stated that even though Penley's suit was "now against Westbrook and no longer the church," it is well-settled that the "interaction between the church and its pastor is an integral part of church government" and "the relationship between an organized church and its ministers is its lifeblood." *Id.* (quoting *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493 (5th Cir. 1974) and *McClure*, 460 F.2d at 558). The supreme court held it was clear from Penley's pleading that Penley's professional negligence claim against Westbrook unconstitutionally impinged upon internal matters of church governance in violation of the First Amendment and the trial court properly dismissed Penley's case against Westbrook. *Westbrook*, 231 S.W.3d at 405.

In *Williams v. Gleason*, 26 S.W.3d 54 (Tex. App.—Houston [14th Dist.] 2000, pet. denied), a dispute arose in connection with a disciplinary action brought by the church's elders against the Williamses. *Id.* at 54. The Williamses sued the elders of the church for libel, slander, and tortious interference with business and/or occupations, among other things. The Williamses alleged they were libeled by statements contained in an instrument through which church disciplinary charges were made against them. Although the Williamses contended their claims arose in tort, the court of appeals concluded that each claim implicated an ecclesiastical matter—the Williamses' subjection to the church's discipline. 26 S.W.3d at 59. The court of appeals stated:

> Instead of suing the church for its disciplinary actions, which would have provided the church with ecclesiastical immunity, the Williamses sued members of the church conducting their disciplinary trial and appeal. Ecclesiastical immunity would be an empty protection if a disgruntled member, denied the chance to sue the religious body, sued instead the members of the religious body who disciplined him. If disciplined members were able to sue the members of the church, as opposed to the church itself, there would be an inappropriate chilling effect on the ability of churches to discipline their members.

*Id.*[3]

---

[3] In *Becker v. Clardy*, 03-10-00376-CV, 2011 WL 675699 (Tex. App.—Austin Dec. 22, 2011, pet. filed) (mem. op.), Becker, a teacher at a parochial school, brought a defamation suit against a co-worker. *Id.* at *1. Like Jennison's argument here, Becker contended the ecclesiastical abstention doctrine applies only to claims against authority figures in the church or the church itself and, therefore, it does not apply to his claims

–10–

We turn to Jennison's pleadings and evidence relevant to the jurisdictional issue. *See Miranda*, 133 S.W.3d at 227–28. Jennison's claims and the damages he seeks arise from Prasifka's alleged defamatory statements. The only defamatory statements allegedly made by Prasifka were made to the church itself in connection with the church's disciplinary process. Jennison makes no allegation the allegedly defamatory statements were made in any other forum. Indeed, Jennison's petition, and Prasifka's letter attached to that petition and contained in the church's business records, confirm Prasifka's complaint was made to a church official in response to a specific request from the church. *See Patton*, 212 S.W.3d at 555 n.12 (distinguishing between alleged defamatory remarks to third persons and remarks published to members of the church community).

Jennison's claims of slander, tortious interference with a contractual relationship, and wrongful discharge are inextricably intertwined with the church's investigation of his performance as a priest and the discipline imposed by the church for inadequate performance. Stated differently, the substance of Jennison's suit relates to internal matters of church governance and discipline. *See Westbrook*, 231 S.W.3d at 392 (church discipline is a core religious function). Whether the alleged defamatory statements by Prasifka were the reason for the church's disciplinary decisions, rather than the other charge in Count I or any of Counts II through X of the Presentment, would require an

against a fellow member of the community and co-worker. *Id.* at *5. The court of appeals rejected this argument, noting the Texas Supreme Court "has applied the Doctrine to tort claims by a church member against other church members who were not in authority positions," citing *Schubert*, 264 S.W.3d at 12 as "holding [the] court lacked jurisdiction to consider [a] church member's assault claims against other church members." *Becker*, 2011 WL 675699 at *5. The court of appeals stated that determination of whether the allegedly defamatory statement was true would require an analysis of the school's discipline decisions in the context of religious moral standards and church doctrine. *Id.* at *4. Whether or not to impose civil tort liability against Clardy for harm to Becker's reputation within the community would necessarily require an analysis of internal church matters and doctrine. *Id.* *See also Westbrook*, 231 S.W.3d at 400 (allegedly defamatory statements could not be "isolated from the church disciplinary process).

Although not binding, we note courts of other jurisdictions have addressed disputes similar to the dispute before us. *See Stepek v. Doe*, 910 N.E.2d 655, 666 (Ill. App. Ct.) (in connection with lawsuit for defamation and intentional infliction of emotional distress brought by priest against two parishioners who alleged during church disciplinary proceedings the priest had sexually abused them, court "obligated to refrain from interfering with the Church's ability to consider the veracity of the [parishioners'] charges through [the internal disciplinary] process"), *pet. denied*, 919 N.E.2d 366 (Ill. 2009); *Hiles v. Episcopal Diocese of Mass.*, 773 N.E.2d 929, 937 (Mass. 2002) ("The First Amendment's protection of internal disciplinary proceedings would be meaningless if a parishioner's accusation that was used to initiate those proceedings could be tested in a civil court."); *Monahan v. Sims*, 294 S.E.2d 548, 552 (Ga. Ct. App. 1982) (ecclesiastical matter where church member responded to an inquiry by the church's chairman of the commission on ministry during an investigation pertaining to canonization of a priest); *Cimijotti v. Paulsen*, 230 F. Supp. 39, 41 (N.D. Iowa 1964) ("The freedom of speech does not protect one against slander, yet a person must be free to say anything and everything to his Church, at least as long as it is said in a recognized and required proceeding of the religion and to a recognized official of the religion."), *aff'd*, 340 F.2d 613 (8th Cir. 1965) (per curiam).

analysis of the church's disciplinary decision-making process. Therefore, adjudication of Jennison's claims would necessarily require an inquiry into and interpretation of canon law, application of church policies, and the church's assessment of Jennison's fitness to perform the duties of a priest. While the elements of Jennison's claims can be ascertained using secular principles, the application of those principles to impose civil tort liability on Prasifka would impinge upon the church's ability to manage its internal affairs and impair the effectiveness of the church's disciplinary process. *See id.* at 399.

Considering Jennison's pleaded claims and the evidence relevant to the jurisdictional issue, we conclude the ecclesiastical abstention doctrine applies to Jennison's claims. *See Miranda*, 133 S.W.3d at 227–28. Because this lawsuit arises from what is essentially an ecclesiastical dispute, the trial court was constitutionally prohibited from exercising subject matter jurisdiction over it. *See Gleason*, 26 S.W.3d at 60. The trial court properly dismissed Jennison's claims of slander, tortious interference with a contractual relationship, and wrongful discharge for lack of subject matter jurisdiction. We, therefore, resolve Jennison's sole issue against him. We affirm the trial court's order sustaining Prasifka's plea to the jurisdiction and dismissing the case for lack of jurisdiction.

ROBERT M. FILLMORE
JUSTICE

111253F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

RAYMOND JENNISON, Appellant

No. 05-11-01253-CV     V.

JEANETTE PRASIFKA, Appellee

Appeal from the 101st Judicial District Court of Dallas County, Texas. (Tr.Ct.No. DC-10-07569-E).
Opinion delivered by Justice Fillmore, Justices Moseley and Myers participating.


In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**. We **ORDER** appellee Jeanette Prasifka recover her costs of this appeal from appellant Raymond Jennison.

Judgment entered January 28, 2013.


_____
ROBERT M. FILLMORE
JUSTICE