**Affirm in part; Reverse and Render in part; Opinion Filed February 1, 2018**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-16-01171-CV

**EVELYN KELLY, Appellant/Cross-Appellee**
**V.**
**ST. LUKE COMMUNITY UNITED METHODIST CHURCH, HENRY MASTERS, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY, AND BERNICE WASHINGTON, IN HER OFFICIAL AND INDIVIDUAL CAPACITY, Appellees/Cross-Appellants**

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-00985**

## MEMORANDUM OPINION

Before Justices Lang, Brown, and Whitehill
Opinion by Justice Lang

Appellant Evelyn Kelly filed this lawsuit against her former employer, St. Luke Community United Methodist Church ("the church"), and two persons affiliated with the church, Pastor Henry Masters and Bernice Washington, (collectively, "appellees") based on circumstances related to the termination of her employment. Kelly's claims against appellees included defamation, negligence, fraud, misrepresentation, and age and sex discrimination. Appellees filed a plea to the jurisdiction respecting all of Kelly's claims and, alternatively, a motion for summary judgment as to those claims. The trial court overruled appellees' plea to the jurisdiction and granted their motion for summary judgment. Both sides appeal from that ruling.

In six issues on appeal, Kelly challenges the trial court's summary judgment as to each of her claims and complains of the lack of a ruling by the trial court on her motion to strike appellees' summary judgment evidence. On cross-appeal, appellees assert the trial court erred by denying their plea to the jurisdiction based on the doctrines of "ecclesiastical abstention" and "ministerial exception."

We decide in favor of appellees as to the applicability of the ecclesiastical abstention doctrine to all of Kelly's claims except the portion of her defamation claim respecting statements allegedly published to persons outside the church. Further, we decide against Kelly as to the trial court's granting of summary judgment on that portion of her defamation claim. We (1) reverse, in part, the trial court's denial of appellees' plea to the jurisdiction; (2) render judgment granting, in part, the plea to the jurisdiction, dismissing the respective claims as to which that plea is granted, and vacating the trial court's summary judgment as to those claims; and (3) affirm the portion of the trial court's order denying the remainder of plea to the jurisdiction and granting summary judgment in favor of appellees as to the portion of Kelly's defamation claim respecting statements allegedly published to persons outside the church.

## I. FACTUAL AND PROCEDURAL CONTEXT

In her live petition at the time of the trial court's challenged order, Kelly stated she was employed as "Director of Operations" at the church for twelve years prior to her "termination" from that position on approximately February 1, 2013. According to Kelly, the circumstances of her "termination" were as follows: (1) in July 2012, Masters became the church's senior pastor; (2) on December 10, 2012, which was the day before Kelly began a scheduled medical leave, she requested a meeting with Masters to discuss his "treatment of her" and explained to Masters that "his tone and the manner in which he treated her suggested that he had a problem with her"; (3) at that meeting, Masters "assured Kelly that he did not have a problem with her"; (4) after that

date, Masters "communicated to staff members that Kelly 'sure made a lot of money'"; (5) although Kelly's salary "had prior approval in the 4th quarter of 2012," during the time Kelly was out on leave, Masters "discussed with the Lay Leader . . . about reducing Kelly's salary by $20,000" and "rewriting [Kelly's] job description"; (6) in January 2013, Masters hired additional employees to work for the church without conducting "the requisite background checks"; (7) while Kelly was out on medical leave, Masters called her to request information on "getting [those] employees paid" and Kelly "questioned how Masters needed payment on individuals who were not approved to work" in accordance with church policies; (8) Kelly returned to work on January 19, 2013; (9) on January 31, 2013, Masters "had an emergency meeting" with the church's "Staff Pastor Parish Relations Committee" ("SPPRC"), of which Washington is the chair, to "discuss [Kelly's] termination"; (10) during that meeting, "it was communicated to committee members and regular laypersons that a Dallas police officer was needed to escort Kelly off the premises during the termination process, because Kelly was 'volatile'"; (11) on February 1, 2013, Kelly was given a letter from the church stating the church had "decided to undergo a major reorganization" and her position was being "eliminated effective February 12, 2013"; (12) Kelly was escorted by Washington and a "uniformed Dallas police officer" to retrieve items from her office at the church and "[t]his act . . . was witnessed by other employees, and lay persons alike"; (13) "Kelly's dismissal" was announced to the congregation at the February 3, 2013 church service and was "announced in the church bulletin for distribution to congregation members and visitors"; (14) "her position was not eliminated; rather within twenty-four hours of her dismissal, the position was advertised in the [c]hurch's weekly newsletter"; and (15) in May 2013, "a new employee was hired and assumed substantially all of Kelly's duties."

In her defamation claim, Kelly asserted Masters and Washington (1) "made defamatory oral statements which were defamation per se, as the statements referenced imputation of a crime

and injury to a [sic] Kelly's business and professional reputation" and (2) "published a statement of fact regarding Kelly and the need for an escort through the church by a uniformed Dallas police officer, the statements referred to by Masters and Washington were false [sic]." In her negligence claim, Kelly asserted the church's actions were negligent because the church "owed Kelly a duty of care to follow church policy" and "breached that duty when there was a variation of church policies." In her fraud and misrepresentation claims, Kelly contended (1) the church, by and through its agents, "made material misrepresentations" that the church "knew to be false" regarding "the elimination of her position," or "made the statements recklessly without any knowledge of its [sic] truth"; (2) "the representations were made with the intention that they should be acted on by Kelly"; and (3) the church "provided information in the course of business that was false" and "did not exercise reasonable care or competence in obtaining or communicating the information." Further, in her claim for "sex and age discrimination," Kelly alleged (1) she was "wrongfully discharged for discriminatory reasons"; (2) "there was no legitimate business justification for her termination because she had always performed satisfactory work"; (3) she was "treated differently based on her sex and age in connection with her compensation, terms, conditions, and privileges of employment"; (4) "[a]fter an unsuccessful attempt to reduce Kelly's salary, Masters misrepresented that a reorganization was imminent— terminating Kelly while hiring additional staff"; (5) "another employee was hired who assumed substantially all of Kelly's former duties"; and (6) "Kelly was qualified to perform the 'new' job but was never considered."

Appellees filed a general denial answer. Additionally, they filed a combined plea to the jurisdiction and, in the alternative, motion for summary judgment respecting all of Kelly's claims. In their plea to the jurisdiction, appellees stated in part (1) the church is "part of the North Texas Conference of the United Methodist Church"; (2) "[t]he decision to eliminate Ms.

Kelly's position was based upon [the church's] need to reorganize [its] internal structure related to programming and staff"; (3) the "reorganization" was based upon two issues: "the development of a new mission/vision" for the church that included "the incorporation of a programmatic structure" based on "the Nurture, Outreach, and Witness (N.O.W.) design, one of the foundational tenets of the United Methodist Church," and "the potential reduction of costs and expenses including possible personnel reductions based upon the new mission/vision"; and (4) as a result of the "reorganization," "[Kelly's] position was eliminated, a [c]hurch administrator position was established and a part-time Director of Evangelism position was created." Specifically, appellees contended the trial court "lacks subject matter jurisdiction over all of Plaintiff's claims pursuant to the Ecclesiastical Abstention Doctrine" because "her claims involve matters of church administration and theology which both the U.S. Supreme Court and the Texas Supreme Court have held should not be adjudicated by courts."

In their motion for summary judgment, appellees asserted in part they are entitled to summary judgment on Kelly's claims because they "can disprove some if not all of the essential elements of Ms. Kelly's theories of recovery." In support of that assertion, appellees cited Texas Rule of Civil Procedure 166a(c). *See* TEX. R. CIV. P. 166a(c). Further, in the portion of their motion for summary judgment respecting Kelly's defamation claim, appellees stated that to prevail on such claim, a plaintiff must establish, among other elements, that the defendant "published" a statement of fact that was defamatory and false. Appellees contended in part that summary judgment is proper on Kelly's defamation claim because Kelly has "no evidence" respecting the "publication" of the complained-of statements described above to "any third person outside of the Church."

The attachments to appellees' plea to the jurisdiction/motion for summary judgment included, in part, (1) excerpts from a deposition of Kelly in which she testified that within

twenty-four hours following her dismissal, the church announced in its newsletter that candidates were being sought for two positions, a full-time "church administrator" and a part-time "director of evangelism"; the responsibilities respecting the new position of "church administrator" appeared to her to be the same as the responsibilities for her previous job as "director of operations"; and although no one at the church told her she could not apply for the new "church administrator" position, she did not apply for that position; (2) an affidavit of Sharon Larkin in which Larkin testified that at the time of Kelly's release from employment by the church, Kelly's salary was $82,000, and in May 2013, Larkin was hired as "church administrator" of the church at a salary of $50,000; (3) an affidavit of Washington in which she testified in part, "On February 12, 2013, the members of the SPPRC met to discuss various issues. . . . During the meeting, I explained that during the January 31, 2013 meeting some SPPRC members stated Ms. Kelly was 'volatile.' I reported this statement during the closed session of the SPPRC. . . ."; (4) excerpts from a deposition of Washington in which she testified in part that "SPPRC minutes are approved by the SPPRC, and then they are presented to the church"; (5) meeting minutes from the January 31, 2013 SPPRC meeting that stated in part, "Process for handling employee dismissal: •Various members discussed various ways that dismissal have been handled • It was also suggested that security be present and that the meeting be held with the door open"; (6) meeting minutes from a February 5, 2013 church council meeting that stated in part, "Pastor discussed the recent action taken by the [SPPRC] to eliminate the Director of Operations position. . . . Comments were made that the [SPPRC] did meet to discuss this matter but the specifics that were discussed. [sic] They could not be shared at this meeting because they are private and they cannot be discussed"; and (7) meeting minutes from the February 12, 2013 meeting of the SPPRC that stated in part, "Washington—a lot of concerns centered around having a police escort Kelley [sic] to her office. 1. How we decided on security was based on

input from SPPRC members who indicated Evelyn was volatile. 2. Our regular security team was not available. 3. [A staff member] knew a police officer on duty in the area and contacted him. He was available for an hour and came to the church."

Kelly filed (1) responses to appellees' plea to the jurisdiction and motion for summary judgment and (2) a motion to strike certain portions of appellees' summary judgment evidence. In her response to the plea to the jurisdiction, Kelly asserted in part that the ecclesiastical abstention doctrine (1) constitutes an affirmative defense that was not "properly pled" by appellees and (2) is also inapplicable because "[Kelly's] termination was not in connection with the church's ecclesiastical disciplinary process," "[Kelly's] claims do not involve theological controversy, but rather a civil simply [sic] a civil law controversy in which church officials happen to be involved," "[Kelly's] claims of slander, are not inextricably intertwined with theological controversy of her performance," and "the substance of [Kelly's] suit does not relate to internal matters of church governance and discipline."

Further, in her response to the motion for summary judgment, Kelly asserted in part, "The false statements in question-allege [sic] that Kelly was volatile, and needed a police presence to be removed from the church." Kelly contended she "satisfied the second prong of her prima facie case of defamation—publication" by showing four "publications" of defamatory statements by Masters and Washington: (1) "[t]he posting of the January 31, 2013 [SPPRC meeting] minutes was the first publication of the defamatory remarks against Kelly"; (2) "[n]ext, in the February 5, 2013 Church Council meeting, the details surrounding Evelyn Kelly's position and subsequent termination were also discussed in intricate detail" in a "public forum"; (3) "[t]he February 12, 2013 [SPPRC] meeting put the details of Evelyn Kelly's termination on display"; and (4) "the posting of the meeting notes [of the February 12, 2013 SPPRC meeting] was the fourth publication." Also, Kelly contended (1) when Masters "announced to the staff on

February 1, 2013, that Ms. Kelly needed a police escort to be removed from the premises," "Masters' omission of the facts from the staff that Evelyn Kelly had not done anything criminally wrong, or had not committed a crime, or done something bad . . . distorted the viewer's perception—essentially creating a substantially false impression of the event," and (2) "according to [Pastor Michael Greene], at least 100 people were present in [the February 5, 2013 church council meeting], some members some non-members—nonetheless Reverend Masters and Bernice Washington allowed for a detailed account of Ms. Kelly's personnel matters and termination to be the focal point of the Church Council."

An appendix attached to Kelly's response to appellees' motion for summary judgment contained a declaration of Kelly in which she stated in part,

> 4. It is well understood at St[.] Luke that personnel matters are not handled publicly. Those matters are left to the Personnel Committee. As a matter of course, the personnel committee would require individuals leave who should not be involved in personnel matters. That did not occur in my case, not only was my issues privy to all the staff, the details of my termination was discussed in Church Council on February 5, 2013 and February 12, 2013. a [sic] true and correct copy of those minutes are attached hereto . . . .
> . . . .
> 17. During [the January 31, 2013 SPPRC meeting], it was communicated to committee members and regular laypersons that a Dallas police officer was needed to assist with my termination and escort me to my office and away from the church property the termination process [sic], reasoning that I was "volatile." See attached, a true and correct copy of the minutes from the January 31, 2013 minutes, the Feb 5, 2013 and February 12, 2013, Church Council Minutes, which were posted and published to the entire church body.
> . . . .
> 20. Defendant Bernice Washington and the Dallas Police Officer escorted me to my office to get my belongings, as I walked to my office with the armed police officer next to me[,] employees witnessed this encounter . . . .
> . . . .
> 24. . . . I've been actively seeking employment, however, with these statements of me being volatile and having been escorted out of the church have [sic] adversely impacted me—these statements which are false, has brought injury to my personal and professional reputation. The statements were used to impeach my honesty, integrity, virtue, and reputation.

(citations to record omitted).[1]

Additionally, that appendix included, among other things, meeting minutes from each of the meetings described above and excerpts from deposition testimony of Washington and church staff member Pastor Michael Greene. The excerpts from Washington's deposition included her testimony that (1) after the February 1, 2013 meeting at which Kelly was told her position was eliminated, Washington and Kelly walked with a police officer through the church to Kelly's office, a distance of "probably 30 yards, 40 yards"; (2) as they walked that distance through the church, Washington saw some church employees; (3) approximately 60 or 70 people attended the February 5, 2013 church council meeting; (4) church council meetings are not limited to church members and "any interested party" can attend; (5) at the February 5, 2013 church council meeting, "[t]he reorganization was discussed" and "Kelly's name was used when [Washington] discussed her being escorted off the premises"; (6) the only people present at the February 12, 2013 SPPRC meeting were "the individuals who were part of the SPPRC"; (7) copies of the minutes of SPPRC meetings are given to SPPRC members and "to the church"; and (8) "anybody in the church can look at [SPPRC] minutes." The excerpts from Greene's deposition included the following portions of his testimony in response to questions from Kelly's counsel:

> Q. How many members were in the [February 5, 2013] Church Council meeting, if you recall?
>
> A. Probably at least 100.
> . . . .
> Q. . . . So we have about 100—were these church members or employees?
>
> A. Yeah, church members.

---

[1] Although Kelly's declaration and her arguments in the trial court and on appeal describe a February 12, 2013 "church council" meeting, the record shows the February 12, 2013 meeting described by her was a meeting of the SPPRC. There is no evidence in the record of a church council meeting on February 12, 2013.

Q. Church members and employees?

A. Yeah.

Q. Okay. So it's open to the public?

A. It's open to all church members, yeah.

Q. Okay. So in this church meeting, questions were raised regarding the police to escort Evelyn Kelly off the premises?

A. Yes.

. . . .

Q. Was there an explanation given why the police was called?

A. The only explanation I remember is, you know, this is the way they do it in corporate.

Further, the meeting minutes from the February 5, 2013 church council meeting included the following statement respecting the elimination of Kelly's position: "Comments were made that the [SPPRC] did meet to discuss this matter but the specifics that were discussed . . . could not be shared at this meeting because they are private and cannot be discussed."

Appellees filed a reply to Kelly's response in which they asserted in part that their plea to the jurisdiction based on the ecclesiastical abstention doctrine "is a jurisdictional bar, not an affirmative defense." Further, appellees argued summary judgment on Kelly's defamation claim is proper because (1) Kelly "has presented no substantiated evidence" to support her claim; (2) "Washington's only use of the word 'volatile' was to report to the [SPPRC] what another member had stated in a previous meeting"; (3) Kelly "produced no evidence that the term 'volatile' was used during the [February 5, 2013] Church Council meeting"; and (4) "[Kelly] failed to present any evidence that the minutes from the SPPRC meetings dated January 31, or February 12, 2013, or minutes from the February 5, 2013 Church Council meeting were 'actually published and posted' on St. Luke's website or were given to members of the congregation or third parties."

Following a hearing, the trial court signed an order in which it ruled as described above and stated, "All other relief sought by any party is DENIED." (emphasis original). This appeal timely followed.

## II. PLEA TO THE JURISDICTION

Because appellees' cross-issue involves jurisdiction, we address that cross-issue first. *See Vines-Herrin Custom Homes, LLC v. Great Am. Lloyds Ins. Co.*, 357 S.W.3d 166, 170 (Tex. App.—Dallas 2011, pet. denied).

### *A. Standard of Review*

A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of a cause of action. *Jennison v. Prasifka*, 391 S.W.3d 660, 664 (Tex. App.—Dallas 2013, no pet.) (citing *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000)). We review a trial court's ruling on a plea questioning the trial court's subject-matter jurisdiction de novo. *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007). When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). We construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent. *Id.*; *see Westbrook*, 231 S.W.3d at 405 (facts pled are to be taken as true where plea to jurisdiction challenges plaintiff's pleadings). "[I]f the pleadings affirmatively demonstrate an incurable jurisdictional defect, then the plea to the jurisdiction must be granted and repleading is not allowed." *Westbrook*, 231 S.W.3d at 394.

A trial court properly dismisses those claims over which it does not have subject matter jurisdiction, but retains claims in the same case over which it has jurisdiction. *See Thomas v. Long*, 207 S.W.3d 334, 338–39 (Tex. 2006); *see also Heckman v. Williamson Cty.*, 369 S.W.3d 137, 152–53 (Tex. 2012) ("[A] plaintiff must demonstrate that the court has jurisdiction over . . .

each of his claims; the court must dismiss those claims (and only those claims) over which it lacks jurisdiction.").

### B. Applicable Law

The ecclesiastical abstention doctrine arises from the Free Exercise Clause of the First Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment. *See* U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."); *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 601 (Tex. 2013); *Jennison*, 391 S.W.3d at 664. Government action can burden the free exercise of religion in one of two ways: by interfering with an individual's observance or practice of a particular faith or by encroaching on the church's ability to manage its internal affairs. *Jennison*, 391 S.W.3d at 664. "The ecclesiastical abstention doctrine stands for the proposition that the First Amendment prohibits civil courts from exercising jurisdiction over matters concerning theological controversy, church discipline, ecclesiastical government, or the conformity of the members of a church to the standard of morals required of them." *Id*. at 665; *accord Masterson*, 422 S.W.3d at 605–06 ("Courts do not have jurisdiction to decide questions of an ecclesiastical or inherently religious nature, so as to those questions they must defer to decisions of appropriate ecclesiastical decision makers"); *see also Westbrook*, 231 S.W.3d at 394 ("Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis of the jurisdictional challenge.").

"To determine whether the ecclesiastical abstention doctrine applies or, conversely, whether subject-matter jurisdiction exists, 'courts must look to the substance and effect of a plaintiff's complaint to determine its ecclesiastical implication, not its emblemata.'" *Jennison*, 391 S.W.3d at 665 (quoting *Westbrook*, 231 S.W.3d at 405) "Even though the elements of a common law tort such as defamation, may be defined by secular principles without regard to

religion, it does not necessarily follow that application of those principles to impose civil tort liability would not run afoul of protections the constitution affords to a church's right to construe and administer church doctrine." *Id*. at 665–66. "Churches have a fundamental right to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Westbrook*, 231 S.W.3d at 397. The Texas Supreme Court has applied the ecclesiastical abstention doctrine to tort claims brought by a church member against other church members who were not in authority positions, *see Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 12 (Tex. 2008) (concluding court lacked jurisdiction to consider church member's assault claims against other church members), and in the context of a claim brought by a church member against her counselor and pastor for statements made in connection with the church's ecclesiastical disciplinary process, *see Westbrook*, 231 S.W.3d at 404–05 (church member's claim was properly dismissed where publication about which church member complained was made in course of church disciplinary process and communicated by pastor to congregation pursuant to requirements of that process).

### C. Application of Law to Facts

In their cross-issue on appeal, appellees assert in part the trial court lacked subject matter jurisdiction over all of Kelly's claims pursuant to the ecclesiastical abstention doctrine because "all of the complained of actions made by [Masters] or [Washington] were made as part of a matter that involved 'theological controversy,' 'church discipline,' and/or 'ecclesiatical government.'" Specifically, according to appellees,

> [T]he discussion regarding Plaintiff's termination, the use of the term "volatile" during a SPPRC Committee meeting and the subsequent announcements and publication of the elimination of the [position held by Kelly] were all components of St. Luke's ability to manage its internal affairs and church discipline. Pursuant to the Free Exercise Clause of the First Amendment of the U.S. Constitution, St. Luke has the right to manage its own affairs, including revising its approach to delivery of ministerial services, eliminating a staff position and informing its membership when a position has been eliminated from the church's organization.

. . . .

St. Luke contends that as a church, it has the power to determine within its religious boundaries how it will establish its organizational structure and dispense its ministries and programs without interference from the courts. Since Plaintiff's claims of negligence, sex and age discrimination, fraud, misrepresentation and defamation are all based upon the Church's decision to redirect its ministerial emphasis, they must be dismissed based upon the ecclesiastical abstention doctrine.

Further, appellees argue in part, "If this Court interferes with [Masters'] attempts to improve the financial position of St. Luke via redistributing finances to accommodate new church goals, this Court will in essence substitute its judgment for that of an ecclesiastical entity in violation of the above-stated principles."

Kelly responds that the ecclesiastical abstention doctrine is inapplicable because her claims "do not involve matters of church administration, church governance or any manner [sic] of theology." Additionally, Kelly asserts in part (1) the ecclesiastical abstention doctrine "provides a broader analysis that encompasses the 'ministerial exception'"; (2) "[m]ore narrowly, if the claim challenges a religious institution's employment decision, the sole jurisdictional inquiry is whether the employee is a member of the clergy or otherwise serves a 'ministerial' function"; (3) "[i]f the employee is a minister, then the 'ministerial exception' applies, preventing secular review of the employment decision without further question as to whether the claims are ecclesiastical in nature"; and (4) "[t]he glaring fundamental cracks in [appellees'] argument, are that they failed to allege sufficient facts to support a finding that Ms. Kelly's position was '*ministerial*.'" (emphasis original).

In their reply brief respecting their cross-appeal, appellees assert in part that Kelly's contention that this case "involves only the ministerial exception" is incorrect. Specifically, according to appellees,

[T]he record reflects the reason for the elimination of the position held by Ms. Kelly was to effectuate a new missional emphasis. This clearly falls squarely within the ecclesiastical abstention doctrine because it implicates the church's

–14–

right to manage its own internal affairs and determine how to effectuate its ministry. Thus Ms. Kelly's response that the ecclesiastical abstention doctrine does not apply is simply incorrect.

Under the "ministerial exception" doctrine, "if an employee is a minister, courts are precluded from reviewing the employment decision regardless of whether the claims are ecclesiastical in nature." *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 625 (Tex. App.—Houston [14th Dist.] 2015, pet. denied); *see also Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 195 n.4 (2012) (concluding ministerial exception "operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar"). To the extent Kelly contends that in cases involving a religious institution's employment decision, the ecclesiastical abstention doctrine is precluded by the "ministerial exception," Kelly cites no authority to support that position and we have found none. Further, at least one court of appeals has considered the applicability of the ecclesiastical abstention doctrine before considering the ministerial exception in a case involving the dismissal of a church employee. *See Shannon*, 476 S.W.3d at 621–25 (considering and rejecting applicability of ecclesiastical abstention doctrine before considering applicability of ministerial exception in case involving church's dismissal of elementary ministries director). In the case before us, we begin our analysis by considering the applicability of the ecclesiastical abstention doctrine. *See id.*

As described above, we construe Kelly's petition liberally in her favor, look to her intent, and take the pleaded facts as true. *See Miranda*, 133 S.W.3d at 226; *Westbrook*, 231 S.W.3d at 405. With respect to her defamation claim, Kelly pleaded in part (1) "it was communicated to committee members and regular laypersons that a Dallas police officer was needed to escort Kelly off the premises during the termination process, because Kelly was 'volatile,'" and (2) the act of Kelly being escorted by Washington and a "uniformed Dallas police officer" to retrieve items from her office at the church "was witnessed by other employees, and lay persons alike."

"Laity" is generally defined as "the great body of the people of a religious faith as distinguished from its clergy." *See* Laity, WEBSTER'S THIRD NEW INT'L DICTIONARY (1981). Based on that definition and a liberal reading of Kelly's petition, we construe the petition to include not only allegations of defamation based on statements to church membership and staff, but also allegations of defamation based on (1) communication by appellees to persons outside the church that "a Dallas police officer was needed to escort Kelly off the premises during the termination process, because Kelly was 'volatile'" and (2) the witnessing of that act by persons outside the church.

Kelly's petition shows that with the exception of the portion of her defamation claim in which she asserts she was defamed by the alleged publication of the statements described above to persons outside the church, all of her claims are based on actions and communications within the church pertaining to internal governance of the church and involving only church leadership, members, and staff. *See Jennison*, 391 S.W.3d at 668 (citing *Patton v. Jones*, 212 S.W.3d 541, 555 n.12 (Tex. App.—Austin 2006, pet. denied) (distinguishing between alleged defamatory remarks published to members of church community and remarks to others outside church community in applying ecclesiastical abstention doctrine)). In other words, the substance of Kelly's claims for negligence, fraud, misrepresentation, age and sex discrimination, and defamatory statements published within the church community relates to internal matters of church governance and each of those claims is "inextricably intertwined" with those internal matters. *See id*. While the elements of those claims can be ascertained using secular principles, the application of those principles to impose civil liability on appellees would impinge upon the church's ability to manage its internal affairs. *See id.*

On this record, we conclude the ecclesiastical abstention doctrine applies to all of Kelly's claims other than the portion of her defamation claim in which she asserts she was defamed by

the alleged publication of the statements described above to persons outside the church. *See id*. Further, we conclude the trial court erred by not dismissing the claims described above as to which the ecclesiastical abstention doctrine applies. *See Masterson*, 422 S.W.3d at 605–06; *Westbrook*, 231 S.W.3d at 394.

We decide in favor of appellees on the portion of their cross-issue respecting the applicability of the ecclesiastical abstention doctrine to all of Kelly's claims except the portion of her defamation claim in which she asserts she was defamed by the alleged publication of the statements described above to persons outside the church.

### III. SUMMARY JUDGMENT

#### A. Standard of Review

We review a trial court's grant of summary judgment de novo. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015). We must "review the evidence presented by the motion and response in the light most favorable to the party against whom the summary judgment was rendered, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311–12 (Tex. 2014) (citing *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009)); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). When, as here, a trial court's order granting summary judgment does not specify the ground or grounds relied on for its ruling, we must affirm summary judgment if any of the grounds advanced is meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989).

No-evidence and traditional grounds for summary judgment may be combined in a single motion. *Coleman v. Prospere*, 510 S.W.3d 516, 518 (Tex. App.—Dallas 2014, no pet.). "A court should determine the standard of proof on a summary judgment motion after considering the substance of the motion, rather than categorizing the motion strictly by its form or title." *Tex.*

*Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 375 (Tex. App.—Dallas 2009, pet. denied). When a party files both a no-evidence and a traditional motion for summary judgment, we first consider the no-evidence motion. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

To prevail on a traditional motion for summary judgment, the movant bears the burden of proving that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

In a no-evidence summary judgment motion, the movant contends that no evidence supports one or more essential elements of a claim for which the nonmovant would bear the burden of proof at trial. TEX. R. CIV. P. 166a(i). The trial court must grant the motion unless the nonmovant raises a genuine issue of material fact on each challenged element. *KCM Fin.*, 457 S.W.3d at 79. No-evidence summary judgment is proper if the nonmovant fails to bring forward "more than a scintilla of probative evidence" as to an essential element for which the movant contends no evidence exists. *Boerjan*, 436 S.W.3d at 312 (citing *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009)).

### B. Applicable Law

"Defamation's elements include (1) the publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) damages, in some cases." *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015). "Publication" of defamatory words means to "communicate the words . . . to a third person capable of understanding their defamatory import and in such a way that the third person would understand." *Double Diamond, Inc. v. Van Tyne*, 109 S.W.3d 848, 854 (Tex. App.—Dallas 2003,

no pet.); *accord Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 335 (Tex. App.—Dallas 1986, no writ).

### C. Application of Law to Facts

In her first issue, Kelly asserts the trial court erred by granting appellees' motion for summary judgment as to her defamation claim. In light of our conclusions above, we address only the portion of that issue respecting Kelly's assertions that she was defamed by (1) statements of appellees to persons outside the church that "a Dallas police officer was needed to escort Kelly off the premises during the termination process, because Kelly was 'volatile,'" and (2) the witnessing of that act by persons outside the church.

In her brief in this Court, Kelly contends in part that she "proved Masters and Washington's statements were published" based on the following:

> Washington's testimony affirms that the notes and minutes from the SPPRC meeting are made public for all members because they are posted or otherwise published to which many people had access. The posting of the January 31, 2013, minutes was the first publication of the defamatory remarks against Kelly.
> Next, in the February 5, 2013, Church Council meeting, the details surrounding Evelyn Kelly's position and subsequent termination were also discussed in intricate detail. . . .[T]he Church Council meetings are for St. Luke members and open to any other person—members or otherwise who want to attend. In Washington's deposition, she testified that for the February 5, 2013 meeting, approximately, 60–70 people were present, Pastor Green testified there were approximately 100 people present. Notwithstanding this public forum, the detailed issues surrounding Kelly's termination were discussed, including her being escorted by a uniformed police officer. . . .
> The February 12, 2013, meeting put the details of Evelyn Kelly's termination on display. Details that should have been confidential or for HR use only. The minutes of this meeting were also posted for the congregation . . . .
> . . . The February 12, 2013, meeting was the third publication, and the posting of the meeting notes was the fourth publication.

(citations to record omitted). In support of those arguments, Kelly cites portions of the evidence described above, including the minutes of the January 31, February 5, and February 12 meetings; deposition testimony of Washington and Greene; and Kelly's declaration.[2]

Appellees respond (1) "all [Kelly] has submitted . . . is that others within the Church learned about her being escorted from the premises and as a consequence she was 'defamed,'"; (2) "the word 'volatile' was only used during two SPPRC meetings on January 31, 2013, and February 12, 2013"; (3) "[Kelly's] contention that the word 'volatile' was used during the February 5, 2013 Church Council Meeting is not true" and "the citations provided by [Kelly] do not establish this assertion"; and (4) Kelly "has no substantiated proof of the publication of the January 31, 2013 or February 12, 2013 minutes" to any "third person outside the Church."

In her reply brief in this Court, Kelly argues in part: (1) appellees "fail to address [that] the minutes of the SPPRC meetings were part of the church council meeting on February 5, 2013, and February 12, 2013, where the details surrounding Evelyn Kelly's position and subsequent termination including the police escort were also discussed in intricate detail . . . before St. Luke members and . . . anyone else who wanted to attend"; (2) although appellees "seem to assert that the burden shifts to Ms. Kelly to show who all obtained a copy of the minutes," Kelly "has the burden to show the defamatory statements were published, and this is shown by Washington's own testimony" that the SPPRC meeting minutes are "given to the church"; (3) "[i]n Washington's deposition, she testified that for the February 5, 2013 meeting, approximately, 60–70 people were present, [and] Pastor Green testified there were approximately 100 people present"; and (4) "[n]otwithstanding this public forum, the detailed

---

[2] As described above, Kelly complains on appeal as to the lack of a ruling in the trial court on her motion to strike appellees' summary judgment evidence. Kelly does not provide any argument or authority in support of that position in her appellate briefing or otherwise address or mention that complaint. Further, the record shows the trial court's order in question stated in part, "All other relief sought by any party is DENIED." (emphasis original). We conclude Kelly's complaint respecting the lack of a ruling on her motion to strike appellees' summary judgment evidence presents nothing for this Court's review. *See* TEX. R. CIV. P. 38.1(i).

issues surrounding Kelly's termination were discussed [at the February 5, 2013 Church Council meeting]."

As a threshold matter, we first address whether appellees' summary judgment motion is in substance a traditional motion for summary judgment, a no-evidence motion for summary judgment, or both. *See Tex. Integrated*, 300 S.W.3d at 375. Although appellees cited the standard for traditional summary judgment in that motion, we "determine the standard of proof on a summary judgment motion after considering the substance of the motion, rather than categorizing the motion strictly by its form or title." *Id*. The record shows that, in substance, appellees argued in their summary judgment motion (1) they are entitled to summary judgment on Kelly's claims because they "can disprove some if not all of the essential elements of Ms. Kelly's theories of recovery" and (2) summary judgment is proper on Kelly's defamation claim because Kelly has "no evidence" respecting the "publication" of the complained-of statements described above to "any third person outside of the Church." On this record, we conclude appellees' motion for summary judgment respecting Kelly's defamation claim was, in part, a no-evidence motion for summary judgment. *See id*. Accordingly, we begin our review by applying the standards applicable to no-evidence motions. *See Boerjan*, 436 S.W.3d at 312.

The record shows the word "volatile" appears once in the meeting minutes of the February 12, 2013 SPPRC meeting described above and Washington stated in her affidavit that she used that word at that meeting. The word "volatile" does not appear in the meeting minutes of any other meetings described above, including the February 5, 2013 church council meeting, which is the only church council meeting described or addressed by the parties. Further, (1) the parties do not dispute that SPPRC meetings are "for the committee members only"; (2) nothing in the record shows any SPPRC meeting minutes were made available to or obtained by persons outside the church community; and (3) Kelly cites no evidence in the record, and we have found

–21–

none, describing use of the word "volatile" at the February 5, 2013 church council meeting or demonstrating, as she asserts, that SPPRC meeting minutes were "part of" the February 5, 2013 church council meeting. Also, although Washington testified that "any interested party" can attend church council meetings, Greene stated as follows respecting the February 5, 2013 church council meeting:

> Q. How many members were in the [February 5, 2013] Church Council meeting, if you recall?
>
> A. Probably at least 100.
> . . . .
> Q. . . . So we have about 100—were these church members or employees?
>
> A. Yeah, church members.
>
> Q. Church members and employees?
>
> A. Yeah.
>
> Q. Okay. So it's open to the public?
>
> A. It's open to all church members, yeah.

Additionally, as to the witnessing of Kelly being escorted by a police officer, Washington testified in part (1) after the February 1, 2013 meeting at which Kelly was told her position was eliminated, Washington and Kelly walked with a police officer through the church to Kelly's office, a distance of "probably 30 yards, 40 yards," and (2) as they walked that distance through the church, Washington saw some church employees. Kelly cites no evidence, and we have found none, that any person outside the church community witnessed her being escorted by a police officer to retrieve items from her office.

On this record, we conclude Kelly has not met her burden to bring forward "more than a scintilla of probative evidence" as to the challenged element of "publication" respecting the portion of her defamation claim in which she asserts she was defamed by (1) statements of appellees to persons outside the church that "a Dallas police officer was needed to escort Kelly

–22–

off the premises during the termination process, because Kelly was 'volatile,'" and (2) the witnessing of that act by persons outside the church. *See Boerjan*, 436 S.W.3d at 312. Therefore, the trial court did not err by granting appellees' motion for summary judgment as to that portion of Kelly's defamation claim. *See KCM Fin.*, 457 S.W.3d at 79. We decide against Kelly on the portion of her first issue respecting that portion of her claim.

## IV. CONCLUSION

We decide in favor of appellees on the portion of their cross-issue respecting the applicability of the ecclesiastical abstention doctrine to all of Kelly's claims except the portion of her defamation claim in which she asserts she was defamed by (1) communication by appellees to persons outside the church that "a Dallas police officer was needed to escort Kelly off the premises during the termination process, because Kelly was 'volatile,'" and (2) the witnessing of that act by persons outside the church. Further, as to that remaining portion of Kelly's defamation claim, we conclude the trial court did not err by granting summary judgment in favor of appellees.

We (1) reverse the trial court's denial of appellees' plea to the jurisdiction as to all of Kelly's claims except the portion of her defamation claim in which she asserts she was defamed by communication by appellees to persons outside the church that "a Dallas police officer was needed to escort Kelly off the premises during the termination process, because Kelly was 'volatile,'" and the witnessing of that act by persons outside the church; (2) render judgment granting the plea to the jurisdiction respecting the claims described above as to which the denial of the plea to the jurisdiction is reversed, dismissing those claims, and vacating the trial court's summary judgment as to those claims; and (3) affirm the portions of the trial court's order pertaining to the denial of appellees' plea to the jurisdiction as to the portion of Kelly's defamation claim respecting the statements described above allegedly published to persons

outside the church and the granting of summary judgment in favor of appellees as to that portion of Kelly's defamation claim.

/Douglas S. Lang/
DOUGLAS S. LANG
JUSTICE

161171F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

EVELYN KELLY, Appellant/Cross-Appellee

No. 05-16-01171-CV     V.

ST. LUKE UNITED METHODIST COMMUNITY CHURCH, HENRY MASTERS, IN HIS OFFICIAL AND INDIVIDUAL CAPACITY, AND BERNICE WASHINGTON, IN HER OFFICIAL AND INDIVIDUAL CAPACITY, Appellees/Cross-Appellants

On Appeal from the 95th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-14-00985.
Opinion delivered by Justice Lang, Justices Brown and Whitehill participating.

In accordance with this Court's opinion of this date, we (1) **REVERSE** the trial court's denial of appellees/cross-appellants' plea to the jurisdiction as to all of appellant/cross-appellee Evelyn Kelly's claims except the portion of her defamation claim in which she asserts she was defamed by communication by appellees/cross-appellants to persons outside St. Luke United Methodist Community Church that "a Dallas police officer was needed to escort Kelly off the premises during the termination process, because Kelly was 'volatile,'" and the witnessing of that act by persons outside the church; (2) **RENDER** judgment granting appellees/cross-appellants' plea to the jurisdiction respecting the claims described above as to which the denial of the plea to the jurisdiction is reversed, dismissing those claims, and vacating the trial court's summary judgment as to those claims; and (3) **AFFIRM** the portions of the trial court's order pertaining to the denial of appellees/cross-appellants' plea to the jurisdiction as to the portion of Kelly's defamation claim respecting the statements described above allegedly published to persons outside the church and the granting of summary judgment in favor of appellees/cross-appellants as to that portion of Kelly's defamation claim.

It is **ORDERED** that appellees/cross-appellants St. Luke United Methodist Community Church, Henry Masters, in his official and individual capacity, and Bernice Washington, in her official and individual capacity, recover their costs of this appeal from appellant/cross-appellee Evelyn Kelly.

Judgment entered this 1st day of February, 2018.