

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00106-CV

_____

IN RE LEE EDWARD THOMAS, ET AL.

Original Mandamus Proceeding

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Who should pastor the small Collier's Chapel Baptist Church in Harrison County and which group of members should control the six figure bank account of the Church are apparently at the heart of this dispute between two groups from that church, an unincorporated non-profit association.[1]  We will refer to the two groups as the Thomas Group (for Lee Edward Thomas, who featured prominently in the actions of this group)[2] and the Cosby Group (for Rick Cosby, who was initially hired by the Church as interim pastor, and then apparently fired by action supported by the Thomas Group and rehired by action supported by the Cosby Group).

As a result of this dispute, the Cosby Group[3] filed this suit against the defendants below, the Thomas Group, and sought injunctive relief to, *inter alia*, gain access to the Church's building, bank accounts, and financial records.  Although the Thomas Group filed a plea to the jurisdiction, the trial court entered a temporary injunction that granted the requested relief, in part.  After the Cosby Group filed a Second Amended Petition, the Thomas Group filed another plea to the jurisdiction, which the trial court denied after a hearing.

The Thomas Group has petitioned this Court for a writ of mandamus requiring the Honorable Brad Morin to enter an order granting the Thomas Group's plea to the jurisdiction, nullifying all previous orders entered in the case below, releasing the funds of the Church, and

---

[1]*See* TEX. BUS. ORGS. CODE ANN. § 252.001(2).  We will refer to this entity as "the Church."

[2]The Thomas Group includes Lee Edward Thomas (Thomas), Johnny Lee McCoy (Johnny), Willie James McCoy (Willie), Johnny Morse Gill (Gill), and Charles Earl McCoy (Charles).  Thomas, Johnny, and Willie are three of the deacons of the Church.  Gill is apparently an interim pastor, and Charles is an inactive member and former deacon.

[3]The lawsuit below was brought in the name of Collier's Chapel Baptist Church on behalf of the Cosby Group.  *See* TEX. BUS. ORGS. CODE ANN. § 252.007(b).  We will refer to the plaintiff below, who is the real party in interest in this mandamus proceeding, as the Cosby Group.

2

removing all restrictions placed on the Thomas Group. Because we find that the trial court lacked subject-matter jurisdiction to consider some of the relief sought by the Cosby Group, we conditionally grant, in part, the Thomas Group's petition for a writ of mandamus.

The dispute occurred after September 2019, when the Church's former pastor left the Church and the members of the deacon board were tasked with finding an interim pastor. On March 7, 2020, the deacon board voted to hire Cosby as interim pastor for six months. Later, the deacon board decided to terminate him, and by letter dated July 8, 2020, and signed by Thomas, Johnny, Gill, and Charles, Cosby was informed that his services as pastor were no longer needed, effective July 8, 2020. The Thomas Group contends that the deacons announced their decision at a Bible study and that a majority of the members agreed with their decision.

Joseph Broadnax, a deacon, testified that, after the deacon board terminated Cosby, Broadnax called a meeting in the Church parking lot around July 11 to vote on whether to make Cosby pastor. On July 21, 2020, there was another meeting[4] of the members of the Church (the July 21 Meeting), at which several resolutions (the July 21 Resolutions) were allegedly passed. The evidence showed that five members of the Church attended the meeting in person, and eighteen members attended by telephone.[5] One of the resolutions named Yutya Thomas, Charles

---

[4]The record does not reflect who called this meeting or how the members were notified of this meeting.

[5]The Cosby Group attached a list setting forth the names of the members of the Church in July 2020 according to the Cosby Group (the Cosby Group's List) and a list setting forth the names of the members of the Church in July 2020 according to the Thomas Group (the Thomas Group's List) to their Second Amended Petition. The Cosby Group's list contains thirty-six active members. The Thomas Group's List contains thirty-nine active members. The Cosby Group's List was apparently prepared by Flora Broadnax in her capacity as "Church Secretary." The Thomas Group's List was apparently prepared by Mary H. Thomas in her capacity as "Church Clerk." "Church Clerk" is listed as an officer of the Church in its bylaws with duties that include "keep[ing] a registry of the members." There is no provision for a "Church Secretary" in the Church's bylaws.

3

Thomas, Gloria McCoy (Gloria), Flora Broadnax (Flora), and Carolyn Crumby (Carolyn) as the finance committee and gave them broad authority over the tithes and offerings, payment of bills, and securing the Church premises.[6] The resolution also purportedly gave these individuals authority to institute legal action to gain control over the Church's funds deposited in a financial institution, secure access to the Church premises, secure and obtain the records of the Church, and engage and pay legal counsel. Another resolution purportedly named TB&T as the depository bank and named Gloria, Flora, and Carolyn as signatories on the Church's bank accounts (the Banking Resolution).[7]

On August 12, 2020, the Cosby Group filed its Original Petition. The Cosby Group alleged that the majority of the Church's members chose Cosby as its senior pastor and that the Thomas Group sought to prevent Cosby from exercising his office. The Thomas Group contended that the Church has no senior pastor; that Gill is the interim pastor; that Thomas, Johnny, and Willie locked Cosby and his supporting members out of the Church building to prevent them from holding service; and that Thomas and Johnny, who had check writing authority, had refused to turn the financial records over to Flora, as a representative of the

---

Under the Church's constitution, only "[m]embers who are in full and active standing may act and vote in transacting the business of the church," and members under sixteen years old do not have voting privileges. The name of one person identified as having attended the July 21 Meeting does not appear on either list. The names of five persons identified as having attended the July 21 Meeting do not appear on the Thomas Group's List. The name of one person identified as having attended the July 21 Meeting is designated on the Cosby Group's List as being underage. If the six persons not listed on the Thomas Group's List and the underage member were not eligible to vote, then the total number of voting members who attended the July 21 Meeting, whether in person or by telephone, was sixteen.

[6]The Thomas Group contends that this resolution was improper.

[7]Thomas testified that the deacon board, not the members of the Church, designate the signatories on the Church's bank accounts.

Church's finance committee. The Cosby Group attached the July 21 Resolutions to its Original Petition.

The Cosby Group sought a temporary restraining order and temporary and permanent injunctions restraining the Thomas Group from changing the locks to the Church property, from entering onto the Church property, and from writing checks or withdrawing funds from any Church bank accounts. The Cosby Group also asked that the Thomas Group be required (1) to turn over the Church's financial records to Gloria, Flora, or Carolyn, (2) to require bank accounts to be modified and maintained in accordance with the Banking Resolution, and (3) to remove signatories supported by the Thomas Group as signatories on the Church's financial accounts.

According to the parties, the trial court granted a temporary restraining order. On August 20, 2020, the Thomas Group filed its Plea to the Jurisdiction as to Restraining Order and argued that the ecclesiastical abstention doctrine barred the trial court from exercising jurisdiction over the matters complained about by the Cosby Group and that it lacked jurisdiction to enter the restraining order. On September 1, 2020, the Thomas Group filed another plea to the jurisdiction in which they reiterated their arguments, asserted that some of the individuals attending the July 21 Meeting were not members of the Church, asserted that the purported pastoral election violated the Church's bylaws, and entered a general denial.

Nevertheless, on September 8, 2020, the trial court declined to rule on the plea to the jurisdiction and, instead, entered a temporary injunction that ordered, *inter alia*, the following:

1.  The members of the Church that supported the [Cosby Group's] positions . . . would have access to the church building for certain specified hours on Sunday, Friday, and Saturday, and all day on Tuesday and Thursday;

5

2. The members of the Church that supported the [Thomas Group's] positions . . . would have access to the church building for certain specified hours on Sunday, Friday, and Saturday, and all day on Monday and Wednesday;

3. The Church's checking account number ending 075 (the 075 Account) at TB&T would be used to pay all customary and ordinary bills, e.g. water and electricity bills, of the Church;

4. The [Cosby Group's] members and the [Thomas Group's] members could each establish new checking accounts to pay their respective pastors and any extraordinary or unusual expense they may incur; and

5. Counsel for [the Thomas Group] produce all bank statements for the 075 Account at TB&T from August 1, 2019, to August 1, 2020, within ten days.

On September 17, 2020, TB&T filed a Petition in Intervention for Interpleader in which it sought to interplead all the Church's funds it held. TB&T alleged that on August 17, 2020, the Church had opened a second checking account with number ending 082 (the 082 Account) and transferred almost all of the money from the 075 Account to the 082 Account, leaving a balance in the 075 Account of $7.20, and a balance in the 082 Account of $300,085.69 at the time of the interpleader. On October 29, 2020, the trial court entered an order (the October 29 Order) that denied the interpleader and ordered the following:

1. The Church open a new account at TB&T and deposit $15,000.00 from the 082 Account into the new account;

2. Flora and Thomas be the only persons with authority to write checks and withdraw funds from the new account, with both of their signatures and authorizations required;

3. The funds from the new account be used only for payment of the Church's ordinary operating expenses, such as utility bills, insurance premiums, lawn care, and necessary repairs and maintenance;

6

4. Statements for all of the Church's accounts at TB&T be sent to both Flora and Thomas;

5. No funds from the 075 Account and the 082 Account may be withdrawn without an order from the trial court; and,

6. TB&T maintain a hold on the remaining funds in the 075 Account and the 082 Account until final judgment is rendered in the lawsuit, and the trial court directs TB&T as to the ownership and disposition of the funds in each of the Church's accounts at TB&T.[8]

After conducting discovery, on April 19, 2021, the Cosby Group filed its Second Amended Petition. In that pleading, the Cosby Group omitted all allegations regarding the election of Cosby and the exclusion of Cosby's followers from the Church building. Based on other allegations, it asserted causes of action against the Thomas Group for conversion of the Church's funds, for breach of fiduciary duty, and for access to the books and records of the Church for the past five years pursuant to Section 252.010 of the Texas Business Organizations Code. In addition, the Cosby Group sought to enjoin the Thomas Group from writing checks, withdrawing funds, or having access to any of the Church's bank accounts; to require the Thomas Group to disclose all financial records of the Church for the last three or five years; enforcement of the July 21 Resolutions; and a partition of the Church's assets between the Cosby Group's members and the Thomas Group's members.

The Thomas Group filed a second Plea to the Jurisdiction on the Second Amended Petition and again argued that the Cosby Group's causes of action and the injunctive relief it sought were barred by the ecclesiastical abstention doctrine. In addition to seeking dismissal of

---

[8]Except for the denial of the interpleader, we construe this order as a supplement to the temporary injunction.

7

the Second Amended Petition, the Thomas Group sought an order from the trial court rescinding the temporary injunction and the October 29 Order and returning all funds taken from the Church's TB&T account to the Church's original accounts. After a hearing, the trial court denied the plea to the jurisdiction.

"Mandamus relief is appropriate when the trial court lacks jurisdiction to hear a case." *In re Lubbock*, 624 S.W.3d 506, 512 (Tex. 2021) (citing *In re Crawford & Co.*, 458 S.W.3d 920, 929 (Tex. 2015) (per curiam); *In re Entergy Corp.*, 142 S.W.3d 316, 321 (Tex. 2004)). Likewise, mandamus relief is appropriate when a trial court enters an order when it lacks jurisdiction to hear the case. *In re Sw. Bell Telephone Co.*, 35 S.W.3d 602, 605 (Tex. 2000). To be entitled to a mandamus, a relator generally must show that the trial court clearly abused its discretion and that it has no adequate remedy by appeal. *In re Prudential Ins. Co.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding). When the trial court issues an order in a case in which it lacks jurisdiction, the order is void and the trial court abuses its discretion. *In re Sw. Bell Telephone Co.*, 35 S.W.3d at 605. Consequently, in such a case, "the relator need not show it did not have an adequate appellate remedy." *Id.*

"Whether a court has subject[-]matter jurisdiction is a question of law." *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) (citing *Tex. Nat. Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002)). "Lack of jurisdiction may be raised by a plea to the jurisdiction when religious-liberty grounds form the basis for the jurisdictional challenge." *Lubbock*, 624 S.W.3d at 512 (quoting *Westbrook v. Penley*, 231 S.W.3d 389, 394 (Tex. 2007)). "We review a trial court's ruling on a plea to the jurisdiction de

8

novo." *Id.* (citing *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 160 (Tex. 2016)).

"The plaintiff has the initial burden in every case to plead and prove the trial court's jurisdiction." *Bray v. Fenves*, No. 06-15-00075-CV, 2016 WL 3083539, at *3 (Tex. App.—Texarkana Mar. 24, 2016, pet. denied) (citing *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 150 (Tex. 2012)). "When a plea to the jurisdiction is filed, we look to the live pleadings to determine if facts have been alleged that affirmatively show the court's jurisdiction." *Id.* (citing *Miranda*, 133 S.W.3d at 226). "The pleadings are construed liberally in favor of the plaintiff, looking to the plaintiff's intent." *Id.* (citing *Miranda*, 133 S.W.3d at 226). "If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court[']s jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend." *Id.* (alteration in original) (quoting *Miranda*, 133 S.W.3d at 227 (citing *Cty. of Cameron v. Brown*, 80 S.W.3d 549, 555 (Tex. 2002))). "Conversely, '[i]f the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend.'" *Id.* (quoting *Miranda*, 133 S.W.3d at 226–27) (citing *Brown*, 80 S.W.3d at 555).

When "the 'plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised.'" *Bray*, 2016 WL 3083539, at *3 (quoting *Miranda*, 133 S.W.3d at 227). "If the evidence creates a fact question regarding the jurisdictional issue," the plea to the jurisdiction

9

cannot be granted. *Miranda*, 133 S.W.3d at 227–28. "However, if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue," the determination of the plea to the jurisdiction becomes a matter of law. *Id.* at 228.

"Churches have a fundamental right under the First Amendment to decide for themselves, free from state interference, matters of church governance as well as those of faith and doctrine." *Lubbock*, 624 S.W.3d at 508–09 (citing *Westbrook*, 231 S.W.3d at 397 (citing *Watson v. Jones*, 80 U.S. 679, 728–29 (1871))). "It is a core tenet of the First Amendment that in resolving civil claims courts must be careful not to intrude on internal affairs of church governance and autonomy." *Id.* (citing *Westbrook*, 231 S.W.3d at 397). "Autonomy extends to the rights of hierarchical religious bodies to establish their own internal rules and regulations and to create tribunals for adjudicating disputes over religious matters." *Id.* (citing *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708–09, 714, 724–26 (1976)). "And it extends to a church's conclusions regarding its own ecclesiastical rules, customs, and laws." *Id.* (citing *Brown v. Clark*, 116 S.W. 360, 363 (Tex. 1909)). "Government action that interferes with this autonomy or risks judicial entanglement with a church's conclusions regarding its own rules, customs, or laws is therefore prohibited by the First Amendment." *Id.* (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993)).

"The ecclesiastical abstention doctrine prohibits civil courts from delving into matters of 'theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them.'" *Id.* at 508–09 (quoting *Milivojevich*, 426 U.S. at 714 (quoting *Watson*, 80 U.S. at 733)). "The doctrine is grounded in

10

the First Amendment, which protects the right of religious institutions 'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Id.* at 509 (quoting *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church*, 344 U.S. 94, 116 (1952)).

"Texas courts have long recognized that courts 'should not involve themselves in matters relating to the hiring, firing, discipline, or administration of clergy.'" *Mouton v. Christian Faith Missionary Baptist Church*, 498 S.W.3d 143, 150 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (quoting *Lacy v. Bassett*, 132 S.W.3d 119, 123 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *McClure v. Salvation Army*, 460 F.2d 553, 558 (5th Cir. 1972); *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.); *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no writ))). Our sister court of appeals explained, "'The relationships between an organized church and its ministers is its lifeblood.' The minister is the primary agent by which a church seeks to fulfill its purpose. Matters concerning this relationship must be recognized as of prime ecclesiastical concern." *Dean v. Alford*, 994 S.W.2d 392, 395 (Tex. App.—Fort Worth 1999, no pet.) (quoting *Tran*, 934 S.W.2d at 743).

However, not all claims against religious institutions are barred by the First Amendment. *Lubbock*, 624 S.W.3d at 513 (citing *Tilton v. Marshall*, 925 S.W.2d 672, 677 (Tex. 1996)). "A court may exercise jurisdiction over a controversy if it can apply neutral principles of law that will not require inquiry into religious doctrine, interference with the free-exercise rights of believers, or meddling in church government." *Id.* (citing *Westbrook*, 231 S.W.3d at 398–400). "Under the neutral-principles methodology, 'courts decide non-ecclesiastical issues such as

11

property ownership based on the same neutral principles of law applicable to other entities, while deferring to religious entities' decisions on ecclesiastical and church polity questions.'" *Id.* (quoting *Masterson v. Diocese of Nw. Tex.*, 422 S.W.3d 594, 596 (Tex. 2013)).

While the Texas Supreme Court has not applied the neutral-principles methodology outside of church property disputes, it has recognized that "lower courts in Texas have found them applicable in certain, narrow circumstances." *Id.* (citing *Shannon v. Mem'l Drive Presbyterian Church U.S.*, 476 S.W.3d 612, 624–25 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (concluding ecclesiastical abstention does not bar suit arising out of church's violation of settlement agreement, which was not inherently ecclesiastical)). The court has stressed that "any exception to ecclesiastical abstention by application of neutral principles must be narrowly drawn to avoid inhibiting the free exercise of religion or imposing secular interests on religious controversies." *Id.* (citing *Jones v. Wolf*, 443 U.S. 595, 603–05 (1979); *Milivojevich*, 426 U.S. at 710). "In other words, courts should consider not only whether a neutral principle exists without regard to religion, but also whether the application of neutral principles would impose civil liability on a church for complying with its own internal rules and regulations or resolving a religious matter." *Id.* (citing *Westbrook*, 231 S.W.3d at 400). Further, even if neutral principles of law are applied, free-exercise concerns, such as a church's standard of morals or church discipline, may still be implicated. *Westbrook*, 231 S.W.3d at 399. In such cases, the ecclesiastical abstention doctrine deprives the court of jurisdiction to resolve the dispute. *Id.*; *Anderson v. Truelove*, 446 S.W.3d 87, 94 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

12

To resolve these disputes under neutral principles of law may require considering evidence such as the church's constitution and bylaws. *See Masterson v. Diocese of N.W. Tex.*, 422 S.W.3d 594, 603 (Tex. 2013). If the application of the neutral-principles methodology involves the examination of a church's constitution or bylaws, "a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in" making its determination. *Jones v. Wolf*, 443 U.S. 595, 604 (1979). In some cases, the church's organizational documents may preclude the court from merely construing them under neutral principles of law to resolve the dispute. *Truelove*, 446 S.W.3d at 94. For instance, if the church's constitution or bylaws incorporate religious concepts in the provision relevant to the controversy, "then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Wolf*, 443 U.S. at 604 (citing *Milivojevich*, 426 U.S. at 709). Or if the church's bylaws do not contain provisions regarding the matter at issue, e.g., the termination of a minister, courts are prevented from construing the bylaws under neutral principles of law to resolve the dispute. *Truelove*, 446 S.W.3d at 94.

"In determining whether ecclesiastical abstention applies, courts will analyze whether a particular dispute is ecclesiastical or merely a civil-law controversy in which the church happens to be involved." *Lubbock*, 624 S.W.3d at 514 (citing *Tran v. Fiorenza*, 934 S.W.2d 740, 743 (Tex. App.—Houston [1st Dist.] 1996, no writ)). "In making this determination, we look to the substance and nature of the plaintiff's claims." *Id.* (citing *Patton v. Jones*, 212 S.W.3d 541, 548 (Tex. App.—Austin 2006, pet. denied)). "Because courts are prohibited from risking judicial entanglement with ecclesiastical matters, . . . if the substance and nature of the plaintiff's claims

are inextricably intertwined with matters of doctrine or church governance, then the case must be dismissed, *Jennison v. Prasifka*, 391 S.W.3d 660, 665, 668 (Tex. App.—Dallas 2013, no pet.)." *Id.*

*The Trial Court Lacked Jurisdiction to Enter the Temporary Injunction*

When the trial court entered the temporary injunction and the October 29 Order, the Cosby Group's live pleading was its Original Petition in which it alleged that Cosby had been chosen as the Church's pastor by a majority of the Church's members, that the Thomas Group contended that the Church did not have a pastor but that Gill was its interim pastor, and that the Thomas Group had locked Cosby and his followers out of the church building. The Cosby Group also attached the July 21 Resolutions that were purportedly passed by a majority of the members in which a new finance committee was elected and new signatories to the Church's bank accounts were named. The Cosby Group sought a temporary restraining order and temporary and permanent injunctions restraining the Thomas Group from denying them access to the Church property, requiring the Thomas Group to turn over the Church's financial records to Gloria, Flora, or Carolyn, and modifying the Church's accounts at TB&T to comply with the Banking Resolution and to remove members of the Thomas Group as signatories to the Church's financial accounts.

The trial court also had before it the Thomas Group's pleas to the jurisdiction that contended that both the Cosby Group's pleadings and the jurisdictional facts showed that the trial court's jurisdiction was barred by the ecclesiastical abstention doctrine. To its pleas, the Thomas Group attached Thomas's affidavit and minutes from the deacon board's meetings that showed

14

that Thomas was chairman of the deacon board and a member of the finance committee of the Church, that the deacon board hired Cosby as a "pastor on trial" for six months in March 2020, that the deacon board terminated Cosby from his duties July 8, 2020, and that Cosby would not return his keys to the Church on his termination, which necessitated a change of the Church's locks.

Thomas also averred that the power to hire and terminate Cosby was given to the deacon board by the Church's bylaws, a copy of which was also attached to the pleas. In addition, Thomas averred that the July 21 Meeting had five persons who attended in person and eighteen who attended by telephone, even though the bylaws had no provision authorizing voting by telephone or holding a meeting without notice that significant changes to the working of the Church would be considered.

When the office of the pastor becomes vacant, the Church's bylaws provide for the election of a pastor search committee, with the duties to screen all the resumes received, recommend an individual to the church to become pastor, and establish a firm voting procedure for selecting the pastor. The bylaws also provide that a senior pastor must be called by a majority[9] of members present during either a regular business meeting or a special called meeting for that purpose after the Church's members have been notified. The notice is required to be given four weeks in advance of the meeting either by letter correspondence or through the weekly worship bulletins. The bylaws also provide that only the pastor, or the chairman of the

---

[9]Broadnax admitted that there had never been a meeting in which a majority of the members voted to call Cosby as pastor.

15

deacon board in absence of a pastor, may call a special church meeting. However, the bylaws do not address the hiring of a "pastor on trial" or the termination of a pastor.

The bylaws set forth a process by which a member is nominated, screened, and elected as a deacon. Regarding the duties and authority of the deacon board, the bylaws provide:

> In accordance with the meaning of the work and the practice in the New Testament, deacons are to be servants to the church. Their task is to serve with the Pastor in performing the pastoral ministries of leading the church in the achievement of its mission, proclaiming the gospel to believers and unbelievers, and caring for the church members.

> In counsel with the Pastor and in accordance with the teachings of the New Testament, they shall have oversight of the discipline of the membership of the church.

The bylaws also set forth certain duties of the finance committee but do not address how the members of the committee are selected.

When we examine the substance and nature of the Cosby Group's claims asserted in its Original Petition, we see that the facts asserted in support of its requested injunctive relief were based on two specific disputes. Those were (1) whether Cosby had been validly elected pastor by a majority of the members of the Church, thereby entitling him to access to the Church, and (2) whether the Thomas Group was obligated to recognize the validity of the July 21 Resolutions by turning over the Church's financial records to those persons named to the finance committee in the resolutions and ceding their signatory authority on the Church's bank accounts to the persons designated as signatories in the resolutions. Thus, the Cosby Group's live pleadings at the time the temporary injunction was entered indicated that the substance and nature of its claims were inextricably intertwined with two areas in which Texas courts have long held the

16

ecclesiastical abstention doctrine bars jurisdiction of the civil courts: the hiring, firing, discipline, or administration of clergy, *see Mouton*, 498 S.W.3d at 150; *Lacy v. Bassett*, 132 S.W.3d 119, 123 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Dean*, 994 S.W.2d at 395; *Tran*, 934 S.W.2d at 743, and a dispute regarding church governance, *see Lubbock*, 624 S.W.3d at 513; *Westbrook*, 231 S.W.3d at 397; *Jennison*, 391 S.W.3d at 665, 668; *Tran*, 934 S.W.2d at 743.

Even if the Original Petition did not affirmatively negate the subject-matter jurisdiction of the trial court to enter the temporary injunction and the October 29 Order, the undisputed jurisdictional facts showed that the Cosby Group's claims were inextricably intertwined with matters of doctrine and church governance and that it could not resolve the controversy solely under the neutral-principles methodology. Although the Cosby Group alleged that a majority of the members had chosen Cosby as pastor, the Thomas Group produced evidence that the deacon board had terminated Cosby as pastor. Consequently, even assuming that a majority of the members chose Cosby as pastor at some time,[10] the trial court would still have to determine whether his termination by the deacon board was valid. As previously noted, the Church's bylaws do not address termination of the pastor. It has been held that when the church's bylaws do not contain provisions regarding the matter at issue, the court is prevented from construing the bylaws merely under neutral principles of law to resolve the dispute, and the ecclesiastical abstention doctrine deprived the court of subject-matter jurisdiction. *Truelove*, 446 S.W.3d at 94.

---

[10]The Cosby Group did not allege any facts, and did not produce any evidence, that showed when or how the majority chose Cosby as pastor.

Further, the trial court would have to determine whether the deacon board had the authority to terminate the pastor. Under the bylaws, the deacons' duties and authority in governing the Church are broadly defined as being "[i]n accordance with the meaning of the work and the practice in the New Testament." To determine whether the deacons' authority included terminating the pastor would require the trial court to resolve a theological question, i.e., what is the meaning of the work and practice of deacons in the New Testament, which is exclusively within the province of the Church. Since the resolution of this issue would entangle the trial court with the Church's conclusions regarding its own rules, customs, or laws, it was barred from resolving the issue. *See Lubbock*, 624 S.W.3d at 513 ("Government action that . . . risks judicial entanglement with a church's conclusions regarding its own rules, customs, or laws is therefore prohibited by the First Amendment." (citing *Church of the Lukumi Babalu Aye*, 508 U.S. at 532)).

The same is true regarding the issue of whether the Thomas Group was obligated to turn over the Church's financial records to the persons named in the July 21 Resolutions and to cede signatory authority over the Church's bank accounts to the persons named in those resolutions. The Cosby Group's live pleadings at the time the injunction was entered based its entitlement to relief on the July 21 Resolutions. Those resolutions showed that five individuals attended that meeting in person, that eighteen individuals attended by telephone, and that all the persons who attended voted in favor of the resolutions. However, the evidence produced by the Thomas Group showed that nothing in the Church's bylaws allowed members to attend a meeting by, or to vote by, telephone. We also note that there is no statutory authority applicable to

18

unincorporated nonprofit associations that permits a meeting to be held by, or voting by, telephonic means. *See* TEX. BUS. ORGS. CODE ANN. §§ 252.001–.018.[11]

Nevertheless, this issue could not be resolved merely by determining whether a majority of members validly voted in favor of the July 21 Resolutions. An independent congregational church, such as this one, may be governed "either by a majority of its members or such other local organism as it may have instituted for the purpose of ecclesiastical government." *Watson v. Jones*, 80 U.S. 679, 724 (1871). The Court explained:

> If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property.

*Id.* at 725. In other words, if a congregational church has organizational documents that establish a governing body and offices and the procedure for selecting those offices, then it is not simply a majority vote of the members on an issue that controls. Rather, if the organizational documents give the governing body authority to decide an issue or provide for a process other than the majority vote of the members, then the governing body's decision or the results of a properly followed process, not the majority vote of the members, controls. The difficulty for the civil courts, as we have seen, arises when the organizational documents do not address the issue or

---

[11]Chapter 6 of the Texas Business Organizations Code authorizes organizations subject to that chapter, under certain conditions, to hold meetings and vote by telephone conference or by another suitable electronic communications system. TEX. BUS. ORGS. CODE ANN. § 6.002. However, only chapters 1, 4, 10, 252, and in some instances, chapter 5, of the Texas Business Organizations Code apply to or govern an unincorporated nonprofit association. TEX. BUS. ORGS. CODE ANN. § 252.017. The Cosby Group contends that the Church is an unincorporated nonprofit association, which the Thomas Group has not disputed.

when the organizational documents couch the authority of the governing body on religious concepts.

In this case, the Church's bylaws established an ecclesiastical government that includes the pastor and the deacon board and set forth, at least in part, the process by which these positions are filled. We have already discussed the bylaws' provision for selecting a pastor. The bylaws also address the selection of a number of other offices: deacon candidates are vetted by the board of deacons, interviewed by both the board of deacons and the pastor, and only on agreement by the pastor and board of deacons are submitted to the members; trustees are nominated through the pastor and the board of deacons; the minister of music is selected on the recommendation of the pastor and approval of the board of directors;[12] and support staff are selected by the pastor and board of directors and approved by the members. In addition, the bylaws do not expressly provide for filling any office in the Church simply by nomination and election by the members. And regarding how members of the finance committee and the signatories on the Church's bank accounts are selected, the bylaws are silent.

Further, Thomas testified that the board of deacons determines the signatories on the bank accounts, then gets the approval of the members. As with the issue of termination of the pastor, determining whether the deacon board has this authority would require the court to resolve a theological question.

---

[12]The bylaws do not provide any details regarding a board of directors but refer to that board in several places. It is unclear whether the referenced board of directors is a misnomer for the board of deacons.

20

Consequently, since the bylaws do not address how the members of the finance committee and the signatories on the Church's bank accounts are selected, the trial court could not resolve the issue merely by applying the neutral-principles methodology, and resolving the issue "risks judicial entanglement with [the C]hurch's conclusions regarding its own rules, customs, or laws," which is prohibited by the First Amendment.[13] *Lubbock*, 624 S.W.3d at 513; *see also Truelove*, 446 S.W.3d at 94.

Just as importantly, the plea to the jurisdiction asserted that individuals who were not members of the Church participated in the July 21 Meeting and in passing the July 21 Resolutions, which placed in issue whether a majority of members had voted in favor of the July 21 Resolutions. As we previously noted, the evidence showed that the Thomas Group claims that there are thirty-nine active members, and the Cosby group claims that there are thirty-six active members. Of the twenty-three persons identified as having voted in favor of the July 21 Resolutions, six do not appear on the Thomas Group's list of active members. If those six persons were not members, then the number of members voting in favor of the resolutions was seventeen, which would be less than a majority under either list.

That being the case, to determine whether a majority voted in favor of the July 21 Resolutions, the court would have to first determine whether those six persons were members of the Church. The bylaws set forth three ways to become a member of the Church: (1) "[a] profession of faith in Jesus Christ as one's personal Saviour and Lord and believer's baptism by

---

[13]In its response, the Cosby Group characterizes this case as a church split or schism and argues that the ecclesiastical abstention doctrine does not usually apply concerning which faction of a church is entitled to property following a split or schism. However, neither the Cosby Group's pleadings nor the evidence supports its contention that there was a church split or schism. Rather, its pleadings and the evidence show that this case involved an internal dispute among the members regarding the governance of the Church.

immersion in water by this church"; (2) "by letter from a church of like faith and practice attesting to this"; and (3) "by the believer's statement when no letter is available after due examination of salvation and scriptural baptism in another church of like faith and practice." Thus, to determine if these six persons were members of the Church, the court would be required to determine what is a profession of faith, what is a church of like faith and practice, or what is a due examination of salvation and scriptural baptism. Yet all of these are theological questions reserved for the church that the courts are barred from considering by the First Amendment. *See Watson*, 80 U.S. at 730 (courts cannot decide who should be members of a church); *Episcopal Diocese of Fort Worth v. Episcopal Church*, 602 S.W.3d 417, 432–33 (Tex. 2020) (courts must defer to the church's ecclesiastical determination of which members are in good standing); *Singh v. Sandhar*, 495 S.W.3d 482, 489 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (issues of denial of membership rights and removal from church's membership list are "exactly the type of ecclesiastical matter[s] into which the civil courts cannot constitutionally intervene"); *Retta v. Mekonen*, 338 S.W.3d 72, 77 (Tex. App.—Dallas 2011, no pet.) ("The question of who may be admitted and who may be excluded from a house of worship is a religious question.").[14]

For these reasons, we find that the ecclesiastical abstention doctrine applied to the Cosby Group's claims asserted in its Original Petition and that the trial court was without subject-matter jurisdiction to enter the temporary injunction and the October 29 Order. Consequently, the temporary injunction and the October 29 Order, to the extent it supplemented the temporary

---

[14]In its response, the Cosby Group asserts that this mandamus proceeding is improper because there is a contested factual issue regarding whether a majority of the members passed the July 21 Resolutions. Because the ecclesiastical abstention doctrine bars the trial court from making this determination, and because the Thomas Group's pleas to the jurisdiction asserted this doctrine, the denial of the pleas to the jurisdiction may be properly asserted in a mandamus proceeding. *See Lubbock*, 624 S.W.3d at 512.

injunction, are void and an abuse of discretion. *In re Sw. Bell Telephone Co.*, 35 S.W.3d at 605. Since the Thomas Group did not have to show that it lacked an adequate remedy on appeal, *id.*, we conditionally grant, in part, the petition for a writ of mandamus regarding the temporary injunction and the October 29 Order.

*The Trial Court's Jurisdiction Over the Cosby Group's Pending Claims and Requests for Relief*

As noted above, after the trial court entered the temporary injunction, and after the parties conducted additional discovery, the Cosby Group amended its petition. When the trial court denied the plea to the jurisdiction, the Cosby Group's live petition asserted causes of action against the Thomas Group for conversion of the Church's funds, for breach of fiduciary duty, and for access to the books, records, and bank statements of the Church for the past five years pursuant to Section 252.010 of the Texas Business Organizations Code. In addition, the Cosby Group sought to enjoin members of the Thomas Group from writing checks, withdrawing funds, or having access to any of the Church's bank accounts, to require the Thomas Group to disclose all financial records of the Church for the last three or five years, to enforce the July 21 Resolutions, and to partition the Church's assets between the Cosby Group's members and the Thomas Group's members. The Cosby Group attached exhibits to its live pleadings in support of its allegations, including two lists of names of persons that the Cosby Group and the Thomas Group, respectively, claimed were members of the Church; affidavits of two church members averring to wrongdoing by Thomas; the Church's constitution and bylaws; a copy of Thomas's deposition transcript; the Thomas Group's responses to the Cosby Group's requests for production and interrogatories; and copies of the resolutions passed at the July 21 Meeting.

23

The Thomas Group's plea to the jurisdiction filed in response to the Cosby Group's live pleading contended that both the Cosby Group's pleadings and the jurisdictional facts showed that the trial court's jurisdiction over the Cosby Group's claims and request for injunctive relief was barred by the ecclesiastical abstention doctrine. The Thomas Group attached copies of Broadnax's deposition and the July 21 Resolutions to its plea to the jurisdiction.[15] We address the Cosby Group's claims and requests for relief separately.

A. *Request to Enjoin the Thomas Group from Writing Checks*, *Withdrawing Funds*, *or Having Access to Any of the Church's Bank Accounts*, *to Enforce the July 21 Resolutions*, *and to Partition the Church's Assets Between the Cosby Group's Members and the Thomas Group' Members*

As in its Original Petition, the Cosby Group's live pleading sought to enjoin the members of the Thomas Group from writing checks, withdrawing funds, or having access to any of the Church's bank accounts, to enforce the July 21 Resolutions, and to partition the Church's assets between the Cosby Group's members and the Thomas Group' members. The live pleadings in support of these requests alleged that, on July 21, 2020, a majority of the members passed resolutions setting up new members of a finance committee to control the Church's finances but that the Thomas Group had refused to abide by the resolutions and claimed that they were improperly enacted. The Cosby Group attached the July 21 Resolutions and the Church's bylaws in support of these allegations.

These allegations and requests for relief are almost identical to those contained in the Cosby Group's Original Petition. For the same reasons we found the lack of subject-matter

---

[15]Because the trial court had not considered the Thomas Group's prior pleas to the jurisdiction, we construe this plea to the jurisdiction and the attached evidence as a supplemental plea to the jurisdiction.

24

jurisdiction to enter the temporary injunction and the October 29 Order, we find that the trial court lacked subject-matter jurisdiction to grant this requested relief. Therefore, we conditionally grant, in part, the writ of mandamus regarding this requested relief.

B. *Access to the Church's Books, Records, and Bank Statements of the Church for the Past Five Years Pursuant to Section 252.010 of the Texas Business Organizations Code*

In this claim, the Cosby Group seeks injunctive relief to insure its access to the books and records of the Church. As we have previously noted, the provisions of Chapter 252 of the Texas Business Organizations Code apply to and govern the Church as a nonprofit association. *See* TEX. BUS. ORGS. CODE ANN. § 252.017(a). Section 252.010 requires a nonprofit association to "keep correct and complete books and records of account for at least three years . . . and [to] make the books and records available on request to members of the association for inspection and copying." TEX. BUS. ORGS. CODE ANN. § 252.010.

In *Lacy*, our sister court of appeals analyzed whether a request made pursuant to a similar statute contained in the Texas Nonprofit Corporation Code, under which the church in that case was incorporated, was barred by the ecclesiastical abstention doctrine. 132 S.W.3d at 124–26. After examining the parameters of the ecclesiastical abstention doctrine, the court of appeals concluded that the doctrine did not apply and stated,

> The trial court was merely called on to uphold the plain language of the Act and ensure Lacy was allowed access to the Church's books and records in accordance with the statute. This judicial function does not jeopardize the ability of religious organizations to establish religious doctrine or develop their internal rules and regulations, nor does it implicate secular interests in purely ecclesiastical matters.

*Id.* at 126. Likewise, in this case, the trial court can determine if, and to what extent, the Cosby Group is entitled to relief by applying the plain language of Section 252.010 without risking

25

judicial entanglement with the Church's conclusions regarding its own rules, customs, or laws, its doctrines, or its government.[16] Consequently, we find that the trial court did not abuse its discretion in denying the plea to the jurisdiction as to this issue.

### C. Claims for Conversion and Breach of Fiduciary Duties

The Cosby Group's pleadings also assert claims against the Thomas Group for conversion of the Church's funds spent without proper authorization and for breach of fiduciary duties. In support of its conversion claim, the Cosby Group alleged that Thomas had allowed Johnny to remain a bank signatory even though he said that Johnny had stolen funds from the Church and that, with the assistance of other Thomas Group members, Thomas had operated the Church like his own private business. In support of its claim for breach of fiduciary duties, the Cosby Group alleged that the Thomas Group failed to keep correct and complete financial records, failed to provide financial records to the Church's members on request, and failed to disclose information to members about the Church's financial condition and transactions.

---

[16]Pointing to the allegations in the Cosby Group's Original Petition, and relying on *Mouton*, the Thomas Group argues that the claims in this case, including the request for access to the books and records, all arise out of a dispute regarding the termination of Cosby and should be barred by the ecclesiastical abstention doctrine. In *Mouton*, the court of appeals held that the various claims asserted by the Moutons were all inextricably intertwined with the selection of a new pastor and the Moutons' expulsion from membership in the church. 498 S.W.3d at 150. Notably, none of the Moutons' claims related to the church's statutory obligation to keep and provide records to its members. Further, although the allegations in the Original Petition are relevant to the determination of whether the trial court had jurisdiction to enter the temporary injunction and the October 29 Order, since it was the Cosby Group's live pleading at the time those orders were entered, in considering whether the trial court had jurisdiction over the Cosby Group's claims and requests for relief at the time it decided the plea to the jurisdiction, only the Cosby Group's allegations in its live pleading, the second amended petition, are relevant to our analysis. *See Heckman*, 369 S.W.3d at 150 ( analysis of a plea to the jurisdiction begins with the live pleadings). The Cosby Group's second amended petition does not contain any allegations regarding the election of Cosby or his exclusion from the premises. Therefore, we do not consider these omitted allegations in our jurisdictional analysis of the claims asserted in the second amended petition.

The First Amendment does not "immunize[] clergy or churches from all causes of action alleging tortious conduct." *Tilton v. Marshall*, 925 S.W.2d 672, 677 (Tex. 1996). If the alleged tort can be established without reference to a church's or its ministers' doctrines, religious beliefs, church discipline, or governance, then the claim will not be barred by the First Amendment. *See id.* at 679 (claim of fraud based on defendant's alleged false representations that he would personally read, touch, and pray over plaintiffs' prayer requests not barred by First Amendment); *Libhart v. Copeland*, 949 S.W.2d 783, 789, 794 (Tex. App.—Waco 1997, no writ) (claims for fraud, constructive fraud, and conversion in connection with the disposition of the church's assets after its dissolution not barred). However, if the alleged tort implicates a church's or its ministers' doctrines, religious beliefs, church discipline, or governance, then the claim will be barred. *See Westbrook*, 231 S.W.3d at 399–400 (claim for professional negligence based on conduct involving church discipline of its members barred by First Amendment); *Tilton*, 925 S.W.2d at 679–80 (claim of fraud based on defendant's alleged false statements of religious doctrine or belief barred by First Amendment); *In re Godwin*, 293 S.W.3d 742 (Tex. App.—San Antonio 2009, orig. proceeding [mand. denied]) (claims for intentional infliction of emotional distress, defamation, and fraud barred by ecclesiastical abstention doctrine because required inquiry into church doctrine, discipline, and beliefs).

Based on the record before us, we cannot say that the Cosby Group's claims for conversion and breach of fiduciary duties are barred by the ecclesiastical abstention doctrine. Regarding its claim for conversion, the Cosby Group's allegations are general and will require discovery to flesh out the bases for its claim. As the evidence is developed, the Cosby Group

27

may rely on evidence that shows one or more members of the Thomas Group made one or more wrongful expenditures of the Church's funds without authorization that does not implicate the Church's doctrines, religious beliefs, church discipline, or governance. It may also develop that the Cosby Group relies on evidence of allegedly wrongful expenditures that implicate the Church's doctrines, religious beliefs, church discipline, or governance, which would be barred by the ecclesiastical abstention doctrine. *See Wolter v. Delgatto*, No. 14-05-00055-CV, 2006 WL 664214, at *1 n.4, *2 (Tex. App.—Houston [14th Dist.] March 16, 2006, no pet.) (mem. op.) (claims for conversion and breach of fiduciary duty that implicated church's doctrine and governance barred).

Because the evidence has not been developed, we cannot say that the trial court clearly abused its discretion in denying the plea to the jurisdiction as to the Cosby Group's claim for conversion. *See Tilton*, 925 S.W.2d at 680.

The Cosby Group's breach-of-fiduciary-duties claims appear to be based on the duties of the finance committee regarding the retention of certain financial records and the provision of the same to the members of the Church as set forth in the Church's bylaws and in Section 252.010(a), previously discussed. The trier of fact should be able to resolve whether one or more members of the Thomas Group breached duties under the Church's bylaws or breached statutory duties by applying neutral principles of law to construe duties under the bylaws and the statute and whether any breach of those duties constituted a breach of fiduciary duties. *See Lacy*, 132 S.W.3d at 124–26. Of course, in determining the Thomas Group's duties under the Church's bylaws, the trial court "must take special care to scrutinize the document in purely secular terms,

28

and not to rely on religious precepts in" making its determination. *Wolf*, 443 U.S. at 604. We find that there was not a clear abuse of discretion in the trial court's denying the plea to the jurisdiction as to this issue.[17]

We conditionally grant, in part, the Thomas Group's petition for a writ of mandamus. As a result, we order the trial court (1) to rescind its temporary injunction dated September 8, 2020, and the October 29 Order (except the denial of the interpleader), (2) to enter such orders as are necessary to restore the Church's funds on deposit at Texas Bank and Trust in any account to the Church's account ending in 082, (3) to the extent necessary, to restore Lee Edward Thomas and Johnny Lee McCoy as the only persons with authority to write checks and withdraw funds from the Church's account ending in 082, and (4) to dismiss the Cosby Group's claims for injunctive relief to the extent they seek to enjoin the Thomas Group from writing checks, withdrawing funds, or having access to any of the Church's bank accounts, to enforce the July 21 Resolutions, and to partition the Church's assets between the Cosby Group's members and the Thomas Group' members. A writ will issue only if the trial court fails to act in accordance with this opinion.[18]

Josh R. Morriss, III
Chief Justice

Date Submitted:     January 13, 2022
Date Decided:       January 14, 2022

---

[17]We express no opinion as to the merits of the Cosby Group's claims for conversion and breach of fiduciary duties.

[18]In its response, the Cosby Group requests sanctions against the Thomas Group for filing an incomplete or misleading record. *See* TEX. R. APP. P. 52.11(c)–(d). We hereby deny the request for sanctions.